[Cite as *In re J.L.*, 2016-Ohio-2858.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re: | : | |
| J.L. et al., | : | No. 15AP-889 |
| | | (C.P.C. No. 13JU-05-6292) |
| (P.F., a.k.a. P.L., and M.L., | : | |
| | | (ACCELERATED CALENDAR) |
| Appellants). | : | |

---

D E C I S I O N

Rendered on May 5, 2016

---

**On brief:** *Erik L. Smith*, for appellant P.F., a.k.a. P.L.

**On brief:** *Jesse A. Atkins*, for appellant M.L.

**On brief:** *Robert J. McClaren*, for appellee Franklin County Children Services.

---

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

SADLER, J.

{¶ 1} Appellants, P.F., a.k.a. P.L., and M.L., appeal from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, granting appellee's, Franklin County Children Services ("FCCS"), amended motion for permanent custody of J.L. and C.L.[1]  For the following reasons, we affirm.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2} This case concerns legal permanent custody of two minor children, J.L., born in July 2005, and C.L., born in January 2010.  The children are siblings who share the same biological parents:  mother, P.F., and father, M.L.

{¶ 3} On May 1, 2013, FCCS filed a complaint stating causes of action in neglect and dependency in regard to both children.  The complaint cited unsanitary and inadequate home conditions, the delayed social and educational development of both

---

[1] Also known as K.L.

children, the parents' lack of supervision and discipline of the children, and the family's previous history with the agency.  Specifically, among other allegations, the complaint stated that five reports of abuse and neglect had been received since the case opening in September 2012.  A December 2012 referral stated that the home was in poor condition with dirty diapers, dog feces, and lots of clutter on the floor.  The mother admitted marijuana use.  Both children were developmentally delayed and not potty trained, and J.L. was cognitively delayed and non-verbal.  In February 2013, J.L. went missing from the home, and, after an hour of searching, was located and returned by police.  Police observed the house to be full of dog feces, roaches, and unsafe debris.  The children were transported to FCCS for safekeeping but then returned to the parents.  About one month later, educational neglect regarding J.L. was substantiated:  he had missed 21.5 days of school, with 16 days unexcused.

{¶ 4}  As a result of the complaint, on May 2, 2013, a magistrate granted a temporary order of protective supervision and appointed counsel for the parents and a guardian ad litem for the mother.  On June 11, 2013, at the request of the state, the magistrate ordered several allegations stricken from the complaint and dismissed the neglect cause of action.  The magistrate then adjudicated the children dependent under R.C. 2151.04(C), made the children wards of the state, and placed them under court-ordered protective supervision while the children remained in the home.  On July 9, 2013, the magistrate held a case plan hearing and subsequently adopted the plan.

{¶ 5}  One month later, on August 8, 2013, FCCS moved for the court to exercise its continuing jurisdiction to modify custody in response to substantiated sexual abuse of C.L. by P.F.'s maternal uncle, C.T.  The incident arose while P.F. was in jail, leaving M.L. to care for the children.  According to the motion, although M.L. knew that C.T. sexually abused P.F. when she was a child and that C.T. had masturbated in front of J.L., he allowed C.L. to stay at P.F.'s sister's home, where C.T. also resided.  P.F.'s sister witnessed C.T. taking pictures of C.L.'s private parts with his cell phone, and it was reported that C.T. french kissed and digitally penetrated C.L., making her bleed.  M.L. allegedly did not want to call the police in order to not put C.L. through an investigation.  FCCS voiced additional concerns, including J.L.'s sexualized behavior, a report of sexual abuse of J.L. in the past, which was unsubstantiated due to his delays and primarily non-verbal

condition, the parents' willingness to allow random people in the home with the children, and the continued "deplorable" condition of the home. (Aug. 8, 2013 FCCS' Motion, 3.)

{¶ 6} On August 9, 2013, the magistrate granted temporary custody to FCCS with a further order for the parent to have supervised visits and to not discuss the case with the children. The visitations were set for every other week at the child's respective facility. On November 6, 2013, FCCS moved to terminate visitations. According to the motion, the children were "making tremendous improvement [in placement] until they visit with their Parents." (Nov. 6, 2013 FCCS' Motion, 2.) The motion describes P.F.'s and M.L.'s continuing state of poor hygiene, and P.F.'s continuing and unaddressed problems with anger. After C.L. returned from her visit with her mother and father with nits in her hair, the agency provided the parents with lice kits and were given simple instruction how to use the kits, but the parents refused to use the kits and continued to arrive at visitations with lice. The parents were also instructed to not bring bags to the visitation after bedbugs and cockroaches were observed to be crawling out of the bags. According to the motion, P.F. was verbally aggressive with FCCS staff, at one point requiring the sheriff to intervene. A cab company contacted FCCS with concerns about the parents' very serious threats to harm agency workers. The motion also indicates that P.F. refused to work with the Franklin County Board of Developmental Disabilities to assist her with her own needs and references a psychological report stating that P.F. struggles with managing her anger when she experiences any conflict, and, when angry, she demonstrates poor judgment.

{¶ 7} On November 8, 2013, the magistrate ordered the visitations terminated pending a November 19, 2013 hearing, and, after the hearing, terminated the visitations pending further order. The magistrate issued an order of temporary custody and commitment to FCCS on January 22, 2014, and an amended case plan was approved and made an order of the court. The order permitted P.F. and M.L. one visitation with J.L. per month, supervised by a counselor at the facility where he had been placed for treatment, with FCCS to provide transportation to and from the visit. The order further specifies that the visit would be suspended if any inappropriate behavior or outbursts occurred during the visits.

{¶ 8} On April 15, 2014, FCCS moved to terminate the visits between the parents and J.L. According to the motion, since the parental visits were reinstated, his sexualized

behaviors had increased, including making increased explicit and mature sexual comments, asking to grab private body parts of staff, and grabbing his roommate's private body parts after a visit. A few days later, the magistrate suspended visitations pending the next hearing.

{¶ 9} On July 7, 2014, FCCS filed a motion for permanent custody, proceeding under R.C. 2151.414(B)(1)(a) and (b), and arguing permanent custody with FCCS is in the best interest of the children. On October 10, 2014, FCCS filed an amended motion for permanent custody, adding R.C. 2151.414(B)(1)(d) to allege the children had been in the custody of FCCS for 12 or more of a consecutive 22-month period.

{¶ 10} On October 14, 2014, P.F. moved for visitation with both children. The court denied the motion on April 20, 2015 after evidence at the hearing showed both children experienced specific negative reactions to visitations with P.F. and M.L. Before visitations, J.L. broke out in hives, and after the visits, J.L.'s deviant and sexual behaviors and sexual speech increased. C.L. regressed in potty training, meltdowns, and speech progression after the visits, reverting to baby-talk.

{¶ 11} The guardian ad litem filed his final report on May 18, 2015, recommending the court grant FCCS' motion for permanent custody.

{¶ 12} The juvenile court held a trial on the amended motion for permanent custody on August 3 through 6, 2015. At the outset of the trial, the judge states that "[w]e're here on the motion for permanent custody as amended filed October 10th, 2014," and proceeds to discuss service of process for both the original and amended complaint. (Aug. 3, 2015 Tr. 4.) The judge then summarized her interview with each child. C.L. believes she has had two mothers: her first foster mom and her current foster mom. She had little to say about her original parents beyond beginning to talk about someone in jail. She expressed that she loves another child in the current foster family and wants to stay with her. The judge did not believe C.L., at age five, had an understanding of adoption but said she loves her foster family very much and was "very firm" about wanting to stay with them. (Aug. 3, 2015 Tr. 11.) Regarding her conversation with J.L., the judge noted he had just learned to speak and was too developmentally delayed to express his wishes about where he wants to live.

{¶ 13} Two caseworkers charged with handling the family's case for FCCS testified. Brooks Jaccaud testified to being the family's FCCS caseworker beginning in August 2013, when the children were already in FCCS' custody. Jaccaud's review of the case showed that the parents were linked with a community service worker since March 2013, Guidestone parent mentoring, mental health counseling, and housing resources. To work toward reunification, the case plan objectives for the parents concerned stable housing and home conditions, psychological evaluations, parenting education, services for the children's special needs, and the children's hygiene. P.F. additionally needed to complete an alcohol and drug assessment and ongoing drug screens. She believed both parents understood the case plan.

{¶ 14} In regard to the stable housing objective, Jaccaud described the initial condition of M.L.'s and P.F.'s home as cluttered but with clear pathways. The kitchen was dirty and had an odor, while the upstairs was fairly cleaned up. She noted a hook lock on the outside of J.L.'s bedroom door. The house had an infestation of bedbugs and cockroaches. The condition of the home then deteriorated, appearing less clean with less clear pathways. Jaccaud opined that the home was not in a condition where she could have recommended a return of the children at that point. The couple was evicted from the home in April 2014 and moved into P.F.'s sister's residence. Because P.F.'s sister would not allow her into her home, Jaccaud was unable to view the condition of that residence. Jaccaud agreed that when the children were removed from the home, the loss of the children's social security income had a residual financial effect on the couple, including their ability to pay rent on housing. Jaccaud testified that she only spoke to the couple a few times about addressing their personal hygiene issues, such as showering and wearing clean clothes, because they would become "very volatile very quickly." (Aug. 4, 2015 Tr. 14.)

{¶ 15} According to Jaccaud, both P.F. and M.L. completed the case plan objective of completing psychological exams. The primary recommendation for P.F. was intensive psychotherapy with someone who could address personality disorder and cognitive delays, as well as completing ongoing drug screens. Jaccaud testified that P.F. sporadically attended counseling at a facility, expressed concerns about the counselor and facility, switched counselors, and was prompted many times to change facilities to suit her

needs.  Jaccaud testified that while she could not change P.F.'s service herself, she gave P.F. contact information for alternative counseling facilities several times.  One of those facilities reported that P.F. made two appointments but then missed them.  Overall, Jaccaud believed that P.F. "refused to address any of her own trauma or her own current mental health concerns at all in counseling."  (Aug. 4, 2015 Tr. 67-68.)  Jaccaud additionally testified that P.F. completed 8 and missed 96 drug screens, even though she or her mentor would remind her or set an alarm on her cell phone, and the agency provided bus passes in order for her to get back and forth to the screening facility.  As to M.L., Jaccaud said the psychological exam recommendations included an observation that he would not necessarily be able to parent effectively if he remained with P.F.  Jaccaud and her supervisor discussed with M.L. the option of separating from P.F. if she were unable to reunify with the children, but M.L. was insistent that he would not separate from her.

{¶ 16} The recommendations additionally included parenting programs to work with the parents on the children's special needs.  When P.F. and M.L. still had visitation with the children, they were linked to parent education through each child's facility, in addition to continuing involvement with Guidestone.  After visits were suspended, the caseworkers continued to regularly work with each parent on their goals, attempted to locate a program to treat P.F.'s counseling needs, and linked P.F. with the National Alliance for Mental Illness ("NAMI").

{¶ 17} Jaccaud described her attempts to engage P.F. in the case plan as difficult, with P.F. quickly becoming volatile and shifting the conversation.  Due to P.F.'s threats against her, the agency directed Jaccaud to not have contact with the couple by herself.  The parents attended "SAR" meetings every three months to review the case plan, and during the first meeting P.F. quickly became upset, banged her head against the wall, threw herself against the wall, and became loud and volatile to the point where she was asked to not return.  (Aug. 4, 2015 Tr. 31.)  P.F. was volatile at each case plan review meeting.  Jaccaud also had difficulties getting M.L. to focus on the case plan instead of getting distracted and upset about other frustrations with his first child or with the court, and taking out the frustration on Jaccaud and her supervisor.  Although he did not escalate as quickly as P.F., M.L. also would become volatile in Jaccaud's view.

{¶ 18} Regarding the case plan objective of learning how to protect their children, Jaccaud testified that she would personally work with the couple on concerns and make suggestions, and the couple also was linked to a parent mentor. Multiple times, Jaccaud discussed with M.L. why the children were removed and what occurred with C.L. M.L. expressed that he did not have a problem with C.L. staying in a home where C.T. lived, even though he knew C.T. allegedly abused P.F. and her sister when they were young. He assumed the uncle had grown out of molesting children and made several statements that the uncle made one mistake. M.L. indicated that he was sorry for making the decision to let C.L. stay in the home, but up until the end of Jaccaud's involvement with the case, M.L. continued to not understand how allowing his daughter to stay in the home with C.T. had posed a danger to her. Likewise, the couple did not have a concern with having people they hardly knew move in with them to help pay the bills or how that could pose a danger to the children if the children were to come back into the home.

{¶ 19} Regarding the visitation component of the case plan, Jaccaud testified that M.L. and P.F. were consistent in attending scheduled visitations. At the visitations, the couple brought appropriate food for children to the visits, and Jaccaud did not witness inappropriate touching between the parents and children. M.L. would attempt to spend most of the time talking about court and the case, and Jaccaud would need to constantly redirect him to interact with the children. He made C.L. cry when he yelled at her not to scribble on his coloring book page. The parents additionally made C.L. cry when they scolded her for calling her foster parent "daddy." (Aug. 4, 2015 Tr. 38.) Jaccaud had to redirect the parents' care and supervision of their children, for example, when P.F. told C.L. to lick spilled yogurt off her shirt or when C.L. used toys inappropriately or ran across a parking lot without intervention from the parents. The couple was generally not receptive to Jaccaud's redirection and would be dismissive. The parents' hygiene at the visitations was also a concern. The parents had lice, and a cockroach was observed coming out of one of their bags. Jaccaud observed C.L. regressing in speech and potty training after the visits with M.L. and P.F. She did not see any affection or very positive interaction between C.L. and M.L. and thought C.L. was bonded to P.F. as a sibling rather than a parent. C.L. expressed that she was fearful of J.L.

{¶ 20} Regarding the case plan objective of understanding the special needs of their children, Jaccaud testified that she had specific discussions with the couple about J.L.'s diagnosis, treatment, and progress, but the couple did not have an understanding of his needs. They were dismissive of the recommendations made by J.L.'s service team about intensive treatment and services and would essentially say that J.L. had behavioral issues that needed controlled. Jaccaud also did not believe the couple understood that C.L. had special needs requiring treatment such as trauma-focused therapy. M.L. disagreed that the molestation would cause ongoing trauma for C.L. in the future, and P.F. would generally respond by referring to her own childhood molestation and how she was just fine.

{¶ 21} Jaccaud testified that after the children were removed, she looked into placement options with the children's maternal grandmother and maternal uncle but ruled them out due to both of their histories with children services and the uncle's pending domestic violence charge. M.L. would not provide her with family names.

{¶ 22} The FCCS caseworker who inherited the case from Jaccaud, Michael Penn, testified that he began working on M.L.'s and P.F.'s case in August 2014. As their caseworker, Penn attempted to assist P.F. and M.L. in implementing their case plan objectives. When he received the case, the children were still in children services' temporary custody, and M.L. and P.F. were residing at P.F.'s sister's house.

{¶ 23} According to Penn, he discussed the case plan with M.L. and P.F. and identified areas that they needed to complete in order to reunify with the children, but the couple would focus on expressing their frustrations with previous caseworkers and on not having visits. Penn was not able to approve their housing because P.F.'s sister was not an approved person due to losing custody of her own children as a result of safety risks. To his knowledge, at the time of the hearing, M.L. and P.F. did not have housing sufficient for the children.

{¶ 24} Regarding P.F.'s counseling, as far as Penn knew, she only attended one session and would make the excuse that she did not feel like she needed counseling. P.F. had also not completed any of the 53 drug screens offered since Penn had the case. Therefore, to his knowledge, P.F. had not sufficiently addressed those components of the case plan.

{¶ 25} Regarding parenting classes, Penn testified that P.F. and M.L. received parenting classes through their visitations with the children, until those visitations were suspended due to the treatment needs of the children. Penn could not link the couple to an appropriate parenting program, so he would talk to the couple about parenting skills and protection issues, such as who they left the children in the care of, proper supervision of the children, and cleanliness of the home. In Penn's view, in response to these discussions, the couple would focus on issues unrelated to achieving the objective and also minimize the expressed concerns. They did not see the need for the various ongoing treatments for the children generally. P.F. would not vocalize that she understood J.L.'s treatment needs. M.L. was able to articulate an understanding that the kids had a lot of needs and had mentioned that he had previously sought help for J.L. by taking him to a behavioral center at Children's Hospital. However, M.L. would minimize the needs of the children and the associated treatments. The couple did not see the need for special therapy for C.L. since the sexual abuse happened when she was so young and did not express or eventually acquire an understanding of how allowing people into their home would put the children at risk. Although M.L. apologized for the incident with C.L., M.L.'s choices of who he allowed to be around his children made Penn concerned about his decision-making ability regarding the children. Overall, based on his observations, Penn did not think P.F. and M.L. made any type of progress in regard to parenting sufficient to meet the case plan objective and testified to his belief that neither parent met case plan objectives warranting reunification with the children.

{¶ 26} In his testimony, Penn provided an update of the current treatment and status of each child. C.L. is doing very well in, and continues to need, individual trauma-focused therapy and family counseling with her foster parents. She is in a special needs preschool and is set to attend kindergarten next year without an IEP due to her progress. Penn does not think C.L. has an ability to grasp the concept of adoption, but believes C.L. is very bonded to her foster family and her foster siblings and says that she loves them. Penn does not believe C.L. has a bond with M.L. and P.F., as she told him they were deceased. J.L. is currently placed at a treatment facility, where he works with a psychologist, a counselor, and a speech therapist to improve his aggression, sexual acting out, developmental delays, and limited verbal abilities. A part of his treatment included

trauma-focused therapy to deal with his prior home life with P.F. and M.L., where he experienced neglect and may have been exposed to sexual abuse. Despite his special needs, J.L. still has the ability to attach to people. He has a significant bond with a particular staff member there, and Penn does not believe J.L. has a bond with P.F. or M.L. and will often change the subject when asked about them. Penn also does not believe J.L. has an ability to grasp the concept of permanent custody. Penn testified that the children had not completed their treatment sufficiently to be able to return to M.L. and P.F. and believed that if returned, J.L. would be unable to verbalize whether or not he was being abused. Should FCCS secure permanent custody, Penn testified that, in accordance with recommendations from J.L.'s therapists, J.L. would continue treatment in his current residential facility in order to stabilize his behavior. When he is stable, he would transition to a "stepdown group home" facility and then over months or even a year later, he would possibly be stable enough to attempt an adoptive home placement. (Aug. 5, 2015 Tr. 48.)

{¶ 27} Penn testified that C.L. and J.L. have been in the custody of children services for 12 months of a consecutive 22-month period, having been in temporary custody of children services since August 9, 2013. No party objected to this statement or challenged it on cross-examination. Penn concluded by stating the position of the agency is that it is not safe or appropriate to return the children to M.L. and P.F. and recommended that both C.L. and J.L. be placed in the permanent custody of children services for purposes of adoption.

{¶ 28} From NAMI, Traci Whitmill testified that she worked as a parent advocate for both P.F. and M.L. from November 2013 to September 2014. Specifically, she worked with the couple on their housing, budget, food, utilities, P.F.'s personal hygiene, M.L.'s employment prospects, and drug screens. According to Whitmill, the couple was not interested in her recommendation of moving to more affordable housing instead of their large half-double unit that was out of their budget and did not follow through with any housing referrals that she made to them. She had repeated conversations about the unclean condition of the home but saw little improvement. Whitmill additionally recommended downsizing P.F.'s expensive cell phone plan, which cost over $100 a

month, but P.F. would not consider cheaper plans. M.L. did not follow up on the employment referrals Whitmill provided him.

{¶ 29} Whitmill testified that P.F.'s behavior was erratic, and P.F. would get very upset anytime anybody told her no or she was not allowed to what she wanted to do with her personal items or with the children. Whitmill observed this behavior at the case plan review meetings where, no matter what was said, P.F. would not listen and instead repeatedly responded "I don't care I want my kids." (Aug. 4, 2015 Tr. 205.) Ninety percent of the time though, P.F. would behave well at the meetings. Whitmill believes P.F.'s personal hygiene and behavior did improve over the course of time she spent with her and that P.F. trusted her and was willing to work with her. Whitmill did not observe problems with M.L.'s hygiene or behavior. Whitmill tried to assist P.F. with setting up drug screens that she had missed, but P.F. insisted that she would not do them anymore. Two or three times during the time Whitmill worked with her, P.F. told Whitmill that she had either smoked marijuana or taken a pain pill that was not hers.

{¶ 30} Whitmill tried to terminate her involvement on the case because of the couple's noncompliance with the objectives of the case plan but, after about one month, Jaccaud persuaded her to return to assist the family. In September 2014, NAMI closed the case because, although the couple would listen toWhitmill, they would not follow through with any suggestions or referrals in order to complete the objectives of their FCCS case plan. Whitmill saw a desire in the couple to do things to get the kids back but no completion of actions to actually make that happen.

{¶ 31} Catherine Zawiska, clinical director of the Lutheran Homes Family and Youth Services, testified to being the family's individual family therapist as well as the group family therapist at J.L.'s residential placement. According to Zawiska, when J.L. first entered the facility, at around age 8, he had moderate developmental delays, which meant he could not speak very well and had fairly low functioning in his daily living skills. He was also verbally and physically aggressive, had impulsive behavior, wore diapers or pull ups, and was acting out sexually, including using mature sexual references along with accurate gestures, grabbing at people's private areas, taking his clothes off, urinating on people, and playing in feces. Prior to visits with M.L. and P.F., he would get very anxious and break out in hives when therapists would talk about his parents coming to see him.

She would also see an increase in his sexual speech and sexual and aggressive behavior during those times. During counseling sessions with his family present, J.L. was very anxious, and Zawiska had a hard time getting both J.L. and P.F. to focus on the therapy sessions.

{¶ 32} Zawiska testified that J.L.'s behavior overall improved since his visitations with P.F. and M.L. were suspended. J.L.'s sexual behavior is less intense and occurs less often, his anxiety has improved, he is doing better at managing his emotions, he has improved his speech and communication ability, and, although he still occasionally wets the bed at night, he uses the restroom on his own and no longer wears diapers. Despite his improvement, Zawiska testified that J.L. requires 24/7 supervision, which she did not believe could be maintained in a home setting. Zawiska recommended that J.L. stay at his current level of care at the residential facility.

{¶ 33} The guardian ad litem for both children, Maurice Henderson, testified to being appointed to the position by the court in February 2013, when the case was opened due to the unclean condition of the home, rather than allegations of abuse. When Henderson initially toured the house that P.F. and M.L. lived in with the children, he thought it was moderately clean and learned that the couple was working with Guidestone to clean up. The inside of the house was extremely cluttered, smelled like body odor, and had dog feces on the floor. When he toured the home, Henderson encountered two individuals kissing in the kitchen. Nobody would tell Henderson who the individuals were, but he thought they may have been living in the house with the family.

{¶ 34} Henderson testified that in his first interaction with the family, he did not have concerns with M.L.'s interaction with the children. M.L. told Henderson that J.L. was in school with an IEP, that he had taken him to Children's Hospital to get services with his behavior, and that he was being potty trained. Rather, Henderson's initial main concern was with P.F.'s interaction with J.L. He witnessed P.F. push J.L. into the couch and play roughly with him, which prompted him to ask the court to appoint her a guardian ad litem immediately after his visit.

{¶ 35} Henderson's first impression of M.L. changed. He became concerned that M.L. was not being forthcoming about J.L. when he learned from the residential program that they had to completely potty train J.L. upon his arrival. He also was concerned that,

although M.L. was extremely truthful and somewhat remorseful about taking C.L. to stay at a house where he knew C.T. lived, M.L. did not believe that C.T. would molest children even though he knew C.T. had molested his wife and her sister as children, and M.L. believed C.L. was too young to be traumatized. Henderson's continuing observations included seeing P.F. exhibit irate, cursing, and threatening behavior to the point he would contemplate finding a deputy and seeing P.F. push J.L. aside.

{¶ 36} Since he began working on the case, Henderson saw J.L.'s behaviors progress. When he first observed J.L., who was seven or eight at the time, J.L. was non-verbal, communicating only with his hands, and was wearing diapers due to a lack of potty training. When J.L. first entered the residential facility, he would throw a tantrum and use explicit sexual language. Now, according to Henderson, J.L. is a very calm child with the ability to speak in complete sentences and understand some of what is discussed. In response to P.F.'s and M.L.'s various motions for visitation, Henderson recommended suspending the visitations for both children due to their regression after visits.

{¶ 37} Regarding the wishes of the children about who they want to live with, Henderson did not believe C.L. understood what permanent custody or adoption means but testified that she indicated she wanted to stay with her foster parents and loves her sister. It took awhile for C.L. to remember P.F. and M.L., and she seemed to think they passed away. Henderson also attempted to have a conversation with J.L. about permanent custody, but J.L. did not understand the topic at all and would not answer questions about P.F. or M.L.

{¶ 38} Ultimately, Henderson testified to his recommendation that the court grant FCCS' motion for permanent custody for purposes of adoption. He based his recommendation on the children's special needs, their progress since being removed, concerns regarding M.L.'s and P.F.'s unmet case plan objectives and, in particular, P.F.'s refusal to complete case plan objectives, and M.L.'s poor judgment regarding the children's safety. He did not think M.L. and P.F. would be able to protect the children.

{¶ 39} P.F. testified that she and M.L. were complying with the case plan. To get her children back, P.F. said she had to go to counseling, parenting classes, do drug screens, get assessed for drug and alcohol, and "go get MRDD and to go look for housing." (Aug. 5, 2015 Tr. 169.) Regarding her own counseling, she said she used to go and

completed around ten sessions, but she did not think it was helping her because her counselor constantly badgered and tried to aggravate her, so she would call him and make up excuses not to go. P.F. testified that she never had any problems at meetings with children services, never got angry except for one time just prior to trial when no one would help her when their housing burned down, and never made threats. P.F. additionally testified that she completed two drug and alcohol drug assessments but stopped because her first caseworker told her she could. P.F. testified that she will not do drug screenings anymore because they have enough drug screenings for her already, and she did not think they benefitted her. According to P.F., she completed the MRDD test, which determined she was not qualified for services related to developmental disabilities.

{¶ 40} Regarding parenting classes, P.F. testified that she and M.L. completed some classes that addressed the children's special needs during visitations with the children, but the classes stopped when their caseworker lied and had their visitations terminated. Regarding general parenting classes, she said she cannot do them because she called a few and they either want the kids with her or they want money she does not have. She agreed that she did not complete the parenting programs but this was because of children services' actions. When asked what she has learned about parenting from the various caseworkers and advocates around her, P.F. replied "I don't know what to say about that." (Aug. 4, 2015 Tr. 165.) When asked what special issues need to be addressed for J.L., she replied "[h]e has – he does like stupid things, like I don't even know why he's even doing it." (Aug. 4, 2015 Tr. 169.) These things included peeing on people and walls, cussing, having screaming fits and throwing himself on the floor, and telling her all the time that he wants to stab her. She had heard at meetings that J.L. is acting out sexually. P.F. would "[j]ust try to get him help" and "[j]ust deal with it" by "just like talk[ing] to him or something, I don't know." (Aug. 4, 2015 Tr. 171-72.) P.F. said she and M.L. did take J.L. to the behavioral health clinic at Children's Hospital, who put him on medication that made him mellow. They also received an IEP from J.L.'s school, but she did not remember those requirements except that they would have him work with a speech teacher. According to P.F., J.L. expressed the desire to return home with them during his visitations. Regarding C.L., P.F. thought she was okay but was still in counseling, not

because of what C.T. did to her but "[b]ecause you guys keep throwing [the molestation] up in her face."  (Aug. 4, 2015 Tr. 172.)

{¶ 41} As to housing, P.F. testified that she is looking for housing but either the rent is too high or nobody would accept them as tenants or talk to her.  P.F. said she tried to get CMHA housing, but CMHA told her she was placed on their waiting list.  P.F. agreed that as of the date of the hearing, she was living at her sister's apartment and did not have a place for the children to go to.  She believes that if FCCS never took her children, she would still have a place to live, but with the children gone, she now lacks the finances to rent a place.

{¶ 42} Concerning her family income, P.F. testified to receiving $733 a month from social security benefits and about $184 in food stamps.  She agreed that she would receive a financial benefit to the children returning in up to $1,400 to $1,500 in additional social security benefits, depending on whether C.L. still qualifies, and she said she would use that money to support the children's well-being.  She and M.L. currently do not pay rent, but they pay her sister's water bill of about $56 per month, a storage bill of $105 per month, her cell phone bill, and at least one credit card bill.  P.F. remembers her caseworker suggesting not having a phone bill in order to put that money toward housing, but P.F. insists she will keep her cell phone.  After all bills due are paid, P.F. estimates that $300 remains each month.  She and M.L. have argued about M.L. getting a job or applying for social security.

{¶ 43} M.L. testified to being the father of C.L., J.L., and a third child also born to him and P.F.  According to M.L., the third child was placed in permanent custody of children services for purposes of adoption due to P.F.'s mental capacity and psychological condition, which allegedly impaired her ability to be a responsible mother at the time.  M.L. agreed that P.F. does sometimes have anger management issues and specifically controlling her temper but believed P.F. could be taught to parent the children and believed he could assist her with understanding how to parent.  M.L. testified that he would not consider attempting to regain the children on his own without P.F. and believed if FCCS returned the children, he could manage the needs and services of both children and P.F.  According to M.L., the stress of dealing with the case plan, children,

and his responsibilities makes him depressed but not to the point he needs therapy or medication.

{¶ 44} According to M.L., children services helped the couple with the cleanliness of their home before ultimately suggesting they move and paying the deposit and first month's rent on a new apartment. M.L. characterized the cleanliness of the homes he lived in as "[s]ometimes poor," and said he and P.F. had 14 cats sharing 2 litter boxes as well as 2 dogs who would relieve themselves inside of the house in the hallway due to a lack of a yard. (Aug. 5, 2015 Tr. 264.) He said they tried to take care of their own hygiene the best they could considering the cost of water bills and laundry. Children services or other agencies or groups involved provided them with cleaning supplies, furniture, bus passes, links to parenting classes, and paid for psychological evaluations. In addition to helping with their home, M.L. remembered children services express concern over keeping the children safe, due to the number of people that were in and out of the home, and remembered catching one of these people touching a juvenile's breasts in the living room in front of J.L.

{¶ 45} Before the children were removed from their custody, M.L. said that to address J.L.'s hyper behavior and lack of control, they took him to a doctor and then to the behavior clinic at Children's Hospital. According to M.L., the medicine provided by Children's Hospital was not working, and he asked them for other suggestions, to no avail. M.L. also said the couple was working with both children on potty training. M.L. agreed that J.L. missed a lot of school when he lived with them.

{¶ 46} When P.F. went to jail, the children were giving him a hard time, so he took up P.F.'s sister's offer to take C.L. overnight. According to M.L., he knew that C.T. had allegedly molested his wife and her sister when they were children, knew that C.T. had masturbated in front of J.L., and personally found him "kinda creepy," but M.L. had "no problem" with C.L. staying in the same home with him "because [C.T.] never illustrated any sexual behaviors around my children." (Aug. 5, 2015 Tr. 243; Aug. 3, 2015 Tr. 106.)

{¶ 47} After the children were removed from the home, M.L. testified that he was "relieved * * * from the case plan" after P.F.'s counselor said he did not need counseling, but then agreed that the case plan still required him to maintain stable and sanitary housing and learn about and be able to handle the children's special needs, among other

items.  (Aug. 3, 2015 Tr. 100.)  M.L. agreed that he did not have stable housing as of the date of the hearing and agreed he had lived in two or three locations since the children were removed from the home.  M.L. said that he and P.F. attended two or three parenting classes and had home-based parenting through children services.  He learned "[a] little bit" from the parenting classes that he attended, such as being more patient and keeping poison away from the kids.  (Aug. 3, 2015 Tr. 110.)

{¶ 48} As to his understanding of J.L.'s special needs, M.L. responded:

> To me he sounds like an out of control person that needs to be addressed * * * I don't understand all the fancy words.  I know that my − my son has behavioral problems and I don't − I don't have the capability to address his problems that need to be addressed * * * but I did reach out and try to get it and nobody didn't want to help me.  So I tried to do the best I could to − to deal with him.

(Aug. 3, 2015 Tr. 122-23.)  M.L. recalled one incident where J.L. was acting like he was trying to have intercourse with C.L., but he "didn't perceive it" like that and believed "[h]e was just horseplaying or whatever it was and then * * * we stopped him."  (Aug. 3, 2015 Tr. 137.)  M.L. believes that, although at the time of the hearing he could not care for J.L., he could handle J.L. if somebody would teach him and that he has tried to seek that help.

{¶ 49} As to his understanding of C.L.'s special needs, M.L. testified that her special needs are mild and she seems normal, and no one had really addressed her needs with him.  M.L. guessed that C.L. would continue counseling.

{¶ 50} M.L., at the time of the hearing, reported no income but was trying to get classified as disabled due to spine and knee conditions and thought he was or would be qualified for social security benefits.  He said he could not work or else P.F.'s social security income would be cut.  Regarding their personal finances, in addition to the bills quantified by P.F., M.L. said P.F.'s cell phone bill cost $121 per month.

{¶ 51} During closing arguments, FCCS twice stated that it established by clear and convincing evidence that both children have been in custody for 12 of a consecutive 22-month period at the time of the filing of the amended motion for permanent custody on October 10, 2014.  In her closing argument, counsel for P.F. states "[c]ertainly, her children have been in Children Services custody for 12 of 22 months, that we can't

dispute."  (Aug. 6, 2015 Tr. 36.)  Similarly, counsel for M.L. states "[t]he only clear and convincing element that we met there's always a — a statutory period 12 out of 22." (Aug. 6, 2015 Tr. 49.)

{¶ 52} On September 9, 2015, the trial court granted FCCS' amended motion for permanent custody and indicated the original motion for permanent custody was moot. In doing so, the trial court found that clear and convincing evidence exists that permanent custody with FCCS, for the purposes of adoption, is in both children's best interest and that under R.C. 2151.414(B)(1)(d), each child had been in the custody of FCCS for 12 of 22 consecutive months.  Appellants filed separate, timely appeals to this court.

## II.  ASSIGNMENTS OF ERROR

{¶ 53}  Appellant P.F. assigns the following as error:

> [1.]  The juvenile court erred in granting permanent custody to FCCS because the children had not been in the temporary custody of FCCS for twelve months when it moved for permanent custody.

> [2.] The juvenile court erred in granting permanent custody to FCCS because it did not properly consider all of the relevant best interest factors.

{¶ 54}  Appellant M.L. assigns the following as error:

> The lower court erred in granting permanent custody to the Franklin County Children Services because the agency failed to prove its case by clear and convincing evidence as required by R.C. Section 2151.414(B)(1) and the holding was not supported by the manifest weight of evidence.

## III.  STANDARD OF REVIEW

{¶ 55} "A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence."  *In re D.S.*, 10th Dist. No. 07AP-479, 2007-Ohio-6781, ¶ 7, citing *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28, *discretionary appeal not allowed*, 103 Ohio St.3d 1429, 2004-Ohio-4524.  Judgments supported by some competent, credible evidence going to all essential elements of the case are not against the manifest weight of the evidence.  *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), paragraph one of the syllabus.  "In considering a trial court's decision to grant permanent custody to

FCCS, this court must determine from the record whether the trial court had sufficient evidence before it." *In re L.M.*, 10th Dist. No. 10AP-445, 2010-Ohio-5447, ¶ 11, citing *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887.

{¶ 56} Furthermore, in reviewing a judgment granting permanent custody to FCCS, an appellate court "must make every reasonable presumption in favor of the judgment and the trial court's findings of facts." *In re P.G.*, 10th Dist. No. 11AP-574, 2012-Ohio-469, ¶ 37, citing *Brooks* at ¶ 59. " '[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment.' " *Brooks* at ¶ 59, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988).

## IV.  DISCUSSION

{¶ 57} All three assignments of error contest the trial court's ultimate decision to award permanent custody to FCCS.  R.C. 2151.414 governs the procedure for granting permanent custody of a child to a public agency such as FCCS.  *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 9.  Pursuant to R.C. 2151.414(B), the trial court may grant permanent custody of a child to an agency if the court determines, by clear and convincing evidence, that it is in the best interest of the child and that any of the following factors apply: (a) the child cannot or should not be placed with the parents, (b) the child is abandoned, (c) the child is orphaned with no relatives of the child able to take permanent custody, or (d) the child has been in the temporary custody of one or more public or private children services agencies for 12 or more months of a consecutive 22-month period.  R.C. 2151.414(B)(1).

### A.  P.F.'s First Assignment of Error

{¶ 58} P.F.'s first assignment of error challenges the trial court's finding that the children were in custody of FCCS for at least 12 of 22 consecutive months under R.C. 2151.414(B)(1)(d).  Specifically, P.F. argues that the filing date of the original motion for permanent custody, rather than the filing date of the amended motion for permanent custody, should serve as the end point of the 12 of 22-month calculation.  In support of this proposition, appellant cites to *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, as applied in *In re C.E.*, 3d Dist. No. 5-09-02, 2009-Ohio-6027.

{¶ 59} As a preliminary issue, we must address whether P.F. waived this issue, as appellee suggests. Generally, this court will not in the first instance consider errors that the appellant could have called to the trial court's attention. *In re Pieper Children*, 85 Ohio App.3d 318, 328 (12th Dist.1993), quoting *State v. Glaros*, 170 Ohio St. 471 (1960), paragraph one of the syllabus. Nonetheless, in limited circumstances, we may apply the doctrine of plain error to review an issue that otherwise would be deemed waived. *In re Johnson*, 10th Dist. No. 03AP-1264, 2004-Ohio-3886, ¶ 14.

{¶ 60} In the context of civil appeals, the plain error doctrine is not favored. *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus. "[R]eviewing courts must proceed with the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings." *Id.* at 121. Furthermore, a "plain error" is one that is "obvious and prejudicial although neither objected to nor affirmatively waived." *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 209 (1982). An error is prejudicial if it "impacted the party's 'substantial rights' by affecting the outcome of the trial." *In re C.C.*, 10th Dist. No. 04AP-883, 2005-Ohio-5163, ¶ 27.

{¶ 61} Here, P.F. was aware that FCCS was proceeding under the 12 of 22-month prong of R.C. 2151.414(B). The amended permanent custody motion clearly added R.C. 2151.414(B)(1)(d), and appellee discussed the amended motion at the hearing and specifically indicated that the date of the amended complaint, October 10, 2015, was the end point used in the calculation to support the 12 of 22-month finding. P.F. did not object or otherwise raise this issue as a point of contention either in response to the amended motion or at the hearing. Moreover, at the hearing, counsel for P.F. stated that the children were "[c]ertainly" in FCCS custody for 12 of 22 months and expressly stated that the 12 of 22 finding was not in dispute. (Aug. 6, 2015 Tr. 36.) As such, P.F. waived this issue for purposes of appeal, and we decline to review the issue under the plain error doctrine.

{¶ 62} Accordingly, appellant P.F.'s first assignment of error is overruled.

### B.  P.F.'s Second Assignment of Error and M.L.'s Assignment of Error

{¶ 63} P.F.'s second assignment of error and M.L.'s sole assignment of error challenge the trial court's determination that clear and convincing evidence showed awarding permanent custody to FCCS was in the children's best interest pursuant to R.C. 2151.414(D)(1).  As such, we will consider these assignments of error together.

{¶ 64} In pertinent part, R.C. 2151.414(D)(1) states:

> [T]he court shall consider all relevant factors, including, but not limited to, the following:
>
> (a)  The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b)  The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c)  The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * * ;
>
> (d)  The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e)  Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

The additional factors referenced in R.C. 2151.414(D)(1)(e) are:

> (7)  The parent has been convicted of or pleaded guilty to one of [a number of offenses apparently inapplicable in this case].
>
> * * *
>
> (8)  The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by

spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

{¶ 65} Both M.L. and P.F. argue that the trial court committed reversible error by failing to properly evaluate the above factors. In addition to challenging the trial court's evaluation of the individual factors, M.L. argues that the record generally does not support the trial court's decision regarding the best interests of the children. According to M.L., "[a]ll that is clear from the testimony is that the [couple is] poor and coping with raising two mentally challenged children" and were able to "somehow manage[] to comply with a number of the cumbersome *support* mechanisms placed before them." (Emphasis sic.) (Appellant M.L.'s Brief, 17-18.) We disagree.

{¶ 66} First, M.L. argues that R.C. 2151.414(D)(1)(a) was improperly evaluated because the children were interacting with their parents as best as could be expected given that they are cognitively delayed. In its decision, the trial court considered both the positive and negative interactions of the children with P.F. and M.L., the negative impact of those visits on the children, the reasons the visits were terminated, C.L.'s loving

response to her current foster family, the break of a sibling bond between C.L. and J.L., and the impressions of the caseworkers and guardian ad litem. In essence, M.L.'s argument ignores record evidence regarding the children's ability to bond and develop positive relationships while progressing behaviorally and cognitively and sidesteps the role P.F. and M.L. had in failing to develop appropriate parental relationships with their children. We find no merit to M.L.'s argument and otherwise find no error regarding this factor.

{¶ 67} Similarly, M.L. argues that the trial court improperly evaluated R.C. 2151.414(D)(1)(b) because the children's cognitive delays rendered them unable to reliably express their wishes. This argument is against the evidence presented in regard to C.L. The judge, caseworker, and guardian ad litem all testified to C.L. consistently and strongly expressing a desire to remain with her current foster family. Furthermore, the record shows that since being removed from P.F.'s and M.L.'s home, C.L.'s delays have improved to a point where she will attend kindergarten next year without an IEP. As such, we find no error in the trial court's consideration of C.L.'s stated wishes. P.F. is correct in asserting that J.L.'s cognitive delays rendered him unable to reliably express his wishes. The trial court's opinion states this very determination. Therefore, we find no merit to M.L.'s argument regarding the court's discussion of R.C. 2151.414(D)(1)(b) and otherwise find no error regarding this factor.

{¶ 68} Next, both P.F. and M.L. argue that the trial court improperly evaluated R.C. 2151.414(D)(1)(c) in only looking at the period where the children were in temporary custody. As stated more specifically by P.F., the trial court committed reversible error by failing to weigh the "pre-removal custodial history" of the children and, instead, "merely reciting the facts that show that the child was in agency custody for twelve months of a consecutive twenty-two month period." (Appellant P.F.'s Brief, 23, 26.) P.F. believes this period is relevant because from birth to 2013, "the children were in the custody of their parents for several years, a time during which the parents were never homeless and showed no sign of custodial instability." (Appellant P.F.'s Brief, 28.) P.F. also states that the trial court may have relied on *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 21, 27, and asks us to reconsider that case's determination that the custodial history factor was satisfied upon proof of the 12 of 22-month custodial time frame.

{¶ 69} As is required by the statute, the trial court does discuss the 12 of 22-month finding.  Appellants waived the merits of this finding, as discussed in P.F.'s first assignment of error.  However, contrary to appellants' position, the trial court also states that prior to that time, the children were only removed from P.F. and M.L. for a few days before being returned to the home.  This statement shows the trial court did consider the pre-removal history of the children and, specifically, that the children were in the custody of P.F. and M.L.  Therefore, we find appellants' argument to be against the language of the decision and without merit and decline to review *K.M.*

{¶ 70} Regarding the subsequent section, R.C. 2151.414(D)(1)(d), M.L. argues that the trial court improperly evaluated R.C. 2151.414(D)(1)(d) because P.F. and M.L. had previously been able to maintain stable housing for a one and one-half year period prior to the home burning down.  This argument is premised on the incorrect conclusion that the couple's one and one-half year stay at P.F.'s sister's house is considered stable housing.  Record evidence established that the housing the couple maintained for one and one-half years was not stable, in that it was not their own housing but rather P.F.'s sister's apartment, and the children would not have been permitted to live with the sister since she previously lost permanent custody of her own children and therefore was not a person FCCS would approve to be in the home.  As such, the trial court's decision to not discuss the couple's alleged ability to maintain housing prior to the fire was not in error, as that previous housing was neither stable nor in place at the time of the hearing.  Therefore, M.L.'s argument regarding the court's improper evaluation of R.C. 2151.414(D)(1)(d) is without merit.

{¶ 71} Furthermore, M.L.'s argument implies stable housing is dispositive of this factor when it is only one aspect of the in-depth discussion the trial court undertook in ultimately finding that C.L. and J.L. are in "great need" of a secure permanent placement, which cannot be achieved without a grant of permanent custody to FCCS.  (Trial Court Decision and Judgment Entry, 20.)  This conclusion is supported by the record.

{¶ 72} As described in detail by the trial court, M.L. and P.F. made little progress on the case plan.  Both P.F. and M.L. completed psychological evaluations and some general parenting classes, and P.F. completed a drug and alcohol screening, eight drug screens, an MRDD assessment, and some counseling sessions.  However, the couple did

not attempt or achieve many objectives despite an array of resources to assist them.  P.F. admits that she refused to take part in drug screens and admits to lying in order to get out of going to counseling sessions.  M.L. admits that the couple does not have stable housing for the children to return to, and testimony from the caseworkers and the NAMI representative show that the couple has a pattern of maintaining unsafe living conditions from home to home, despite being provided services and supplies.  The couple currently survives on P.F.'s social security check of $733 per month, but M.L. refused to follow-up on the NAMI advocates employment lead and cites possible social security benefits in the future as his path to financial improvement.  Both P.F. and M.L. blame FCCS for their lack of additional income and secure housing because FCCS took the children and their extra social security checks away.  In addition, ample evidence showed the couple's resistance to services and, particularly, their lack of understanding and minimization of their children's special needs, trauma, and treatments.  P.F.'s testimony demonstrated no understanding or commitment to continuing the children's therapies, while M.L.'s testimony regarding his understanding and commitment to continuing the children's therapies was vague at best.

{¶ 73} Moreover, the trial court expressed concern for the safety threat flowing from the couple's poor decision making and, particularly, the couple's demonstrated lack of regard for who had access to their home and to the children.  Record evidence supports the validity of this concern.  M.L. had no problem letting C.L. stay in the home with a sexual predator when he admittedly knew that man had allegedly sexually abused his own wife and her sister, and he knew this man masturbated in front of his son.  Likewise, both P.F. and M.L. had no problem allowing adults in their home with their children and resisted suggestions to stop this behavior in the future.  This point was sharpened by the trial court's description of the former case in which the couple lost permanent custody of their eldest son due in part to those same poor decisions, such as allowing ten adults to share their home, one of whom they knew to be a convicted sex offender.  The trial court found the similarities between the two cases, ten years apart, to be "numerous and the consequences are disastrous," and we agree.  (Trial Court Decision and Judgment Entry, 20.)  Considering the above, sufficient record evidence supports the finding of the trial

court that C.L. and J.L. are in need of a secure permanent placement, which cannot be achieved without a grant of custody to the agency.

{¶ 74} Under the last factor, R.C. 2151.414(D)(1)(e), M.L. argues that most of the subsections did not apply. While that is true, in its analysis, the trial court did not suggest that any inappropriate section did apply and listed the only applicable section, (E)(11), to reflect that the couple previously had their parental rights involuntarily terminated with respect to an older sibling of J.L. and C.L. As such, the trial court complied with R.C. 2151.414(D)(1)(e) in considering whether "any of the factors in divisions (E)(7) to (11)" applied, and we find no error.

{¶ 75} Overall, our review of the trial court's decision reveals that the trial court properly considered the relevant factors set forth in R.C. 2151.414(D) and that sufficient, competent, and credible evidence in the record supports the trial court's findings. The weight of the evidence supports a firm belief or conviction that the best option for J.L. and C.L. is a commitment to the permanent custody of FCCS for the purposes of adoption.

{¶ 76} For the foregoing reasons, P.F.'s second assignment of error and M.L.'s sole assignment of error are overruled.

## V. CONCLUSION

{¶ 36} Having overruled appellant P.F.'s two assignments of error and appellant M.L.'s sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

DORRIAN, P.J., and LUPER SCHUSTER, J., concur.

_____