**[Cite as *In re A.A.*, 2024-Ohio-224.]**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| [A.A.], neglected minor, | : | No. 23AP-152 |
| | | (C.P.C. No. 19JU-9131) |
| [F.I., Mother], | : | |
| | | (REGULAR CALENDAR) |
| Appellant. | : | |

D E C I S I O N

Rendered on January 23, 2024

**On brief:** *Robert J. McClaren*, for Franklin County Children Services.

**On brief:** *Alana Van Gundy*, for appellant.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

DORRIAN, J.

{¶ 1} Appellant, F.I., mother of A.A., a minor child, appeals the February 16, 2023 decision and judgment entry of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, which granted permanent custody of A.A. to appellee Franklin County Children Services ("FCCS"). For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} On August 8, 2019, FCCS filed a complaint alleging A.A. was an abused, neglected, and dependent child pursuant to R.C. 2151.031(C) and (D), 2151.03(A)(2), and 2151.04(C), respectively. That same day, a preliminary hearing was held before a juvenile court magistrate. Appellant was present at the hearing and represented by counsel. Appellant testified that she and A.A.'s father, M.A., were married and lived in Somalia when A.A. was born. An attorney representing Permanent Family Solutions Network ("PFSN")

apprised the magistrate that FCCS was seeking a temporary order of custody ("TOC") because appellant had recently pleaded guilty to a charge of criminal mischief following an incidence of domestic violence against A.A.; as a result of community control sanctions imposed upon her conviction, appellant was ordered to have no contact with A.A. for two years. Following the hearing, the magistrate entered an order terminating a previously entered emergency care order and granted FCCS' request for a TOC.

{¶ 3} On August 13, 2019, a magistrate filed findings of fact and conclusions of law finding FCCS made reasonable efforts to prevent removal of A.A. from the home. The magistrate outlined the facts surrounding the failure to prevent the removal of A.A. from the home as follows: "On August 7, 2019, [appellant] was observed to be verbally abusive to [A.A.] near or around [A.A.'s] school. [Appellant] and [A.A.] left, and when [A.A.] returned he was upset and crying. He had a welt on his head. He reported that [appellant] threw her iPhone at him. [Appellant] was charged with Criminal Mischief and was * * * court ordered to stay away from [A.A.] for two (2) years." (Findings of Fact at 1.)

{¶ 4} On September 4, 2019, attorney Donald G. Worley was appointed as guardian ad litem ("GAL") for A.A. The GAL filed his first report on September 24, 2019. Therein, after recounting the criminal proceedings against appellant, the GAL noted he met with A.A. on September 12, 2019 at his then-foster-home in Mansfield, Ohio. After the foster parents requested A.A. be removed from their home due to his behavioral issues, A.A. was placed in a residential treatment facility in the Cincinnati, Ohio area. The GAL further noted that A.A. was convinced appellant hated him and that neither A.A. nor appellant had requested visitation. The GAL recommended mental health assessments for both appellant and A.A.

{¶ 5} On October 30, 2019, a magistrate conducted a hearing on the abuse, neglect, and dependency complaint. Appellant did not attend the hearing due to illness; however, her counsel appeared and advocated on her behalf. The assistant prosecuting attorney noted the parties had agreed to proceed uncontested on the neglect cause of action with the recommended dismissal of the abuse and dependency causes of action. On November 7, 2019, the magistrate issued an order (effective October 30, 2019) dismissing the abuse and dependency causes of action, finding A.A. to be a neglected child, pursuant to R.C. 2151.03(A)(2), terminating the TOC, making A.A. a ward of the court, and granting

temporary court commitment ("TCC") to FCCS pursuant to R.C. 2151.353(A)(2). The order also approved and adopted the case plan filed by FCCS. The juvenile court adopted the magistrate's order the same day.

{¶ 6} On June 25, 2020, FCCS and PFSN filed a motion requesting a first extension of TCC. A hearing on the motion was set for July 29, 2020. The GAL filed his second report on July 17, 2020. Therein, the GAL noted he had met with A.A. three times—once in A.A.'s foster home and twice in the residential treatment facility in Cincinnati. The GAL reiterated A.A.'s belief that appellant hated him and that neither A.A. nor appellant had requested visitation. The GAL noted that treatment facility personnel indicated A.A. was ready to leave the facility and FCCS was looking into placement options for A.A.

{¶ 7} The July 29, 2020 hearing on the motion for first extension of TCC was held via videoconference before a magistrate. Appellant did not appear; no explanation was provided regarding her absence. Counsel for PFSN averred that if appellant made progress on her case plan, PFSN would likely petition her public defender to request the municipal court to lift the two-year no contact order. A PFSN caseworker stated a foster home had been located for A.A. and that he would need to be linked with counseling. The GAL averred that A.A. had not requested to see appellant and appellant did not want A.A. to return home even if the two-year no contact order was lifted. At the conclusion of the hearing, the magistrate, citing the municipal court's no contact order, indicated she would grant the request for a first extension of TCC for a period of six months. On August 3, 2020, the magistrate issued a decision to that effect, which was adopted by the juvenile court in a judgment entry filed that same day.

{¶ 8} On December 2, 2020, FCCS and PFSN filed a motion seeking a second and final extension of TCC. A hearing on the motion was set for January 14, 2021. The GAL filed his third report on January 11, 2021. The GAL reported that appellant had made no effort to seek modification of the municipal court's two-year no contact order. The GAL further reported that he had met with A.A. on six occasions; the most recent meeting occurred on October 31, 2020 after A.A. was released from the residential treatment facility and returned to his prior foster home.

{¶ 9} The January 14, 2021 hearing on the motion for a second and final extension of TCC was held before a magistrate via videoconference; appellant appeared via telephone.

Counsel for appellant asserted that appellant did not contest the motion; accordingly, the magistrate indicated he would grant the request for a second and final extension of TCC for a period of six months. On January 25, 2021, the magistrate issued a decision to that effect, which was adopted by the juvenile court in a judgment entry filed that same day.

{¶ 10} On April 14, 2021, a magistrate held a hearing via videoconference for purposes of setting an annual review date; appellant appeared via telephone. Counsel for PFSN averred that appellant had nine children, including A.A., and was currently pregnant; counsel further asserted that the two-year no contact order was due to be lifted in July 2021. Appellant disputed that she struck A.A. with a cell phone. On April 27, 2021, the magistrate issued a decision maintaining TCC of A.A. and setting the matter for annual review; the juvenile court adopted the magistrate's decision in a judgment entry filed the same day.

{¶ 11} On May 25, 2021, FCCS filed a motion for permanent court commitment ("PCC") of A.A. The GAL filed his fourth report on June 19, 2021. Therein, the GAL noted that due to the no contact order imposed by the municipal court, appellant had not seen A.A. for more than two years. The GAL further reported that appellant had previously indicated A.A. was a liar and she did not want him back in her home; however, appellant had recently indicated she might take A.A. back. The GAL also averred that he met with A.A. at least eight times; the latest visit was on June 17, 2021 in A.A.'s foster home. The GAL again noted A.A.'s belief that appellant hated him and that neither appellant nor A.A. had requested visitation. The GAL further averred A.A. indicated he had no desire to see appellant. The GAL further asserted that A.A. hoped to be adopted by his current foster parents; however, the foster parents had not yet committed to adopting A.A. The GAL supported FCCS' motion for permanent custody, averring that such was in A.A.'s best interest.

{¶ 12} On June 29, 2021, a hearing was held before a magistrate regarding the PCC motion. Noting that appellant had not contested prior proceedings related to A.A., counsel for FCCS sought clarification of appellant's position on the PCC motion. Appellant's counsel indicated that appellant was challenging the PCC motion. Counsel for FCCS averred that neither A.A. nor appellant wanted visitation; indeed, A.A. consistently refused to see his mother.

{¶ 13} On February 8, 2022, the juvenile court held a hearing regarding the motion for PCC. Appellant did not appear for reasons unknown to her counsel. Counsel for FCCS described the relationship between appellant and A.A. as a "profound parent-child conflict" which stemmed from the August 2019 incident that led to appellant's conviction and the two-year no contact order. (Feb. 8, 2022 Tr. at 4.) Noting the current case plan contained no provision for visitation between appellant and A.A. as a result of appellant's criminal conviction involving A.A., counsel for FCCS requested the court issue an order allowing visitation between appellant and A.A. subject to the recommendation of a family counselor. The GAL noted that A.A. had been out of the home for over two years and had spoken to appellant only once or twice during that time. The GAL agreed that family counseling for appellant and A.A. could be beneficial. The GAL further averred that A.A.'s current foster placement had been successful but would end soon because the foster parents were not willing to adopt him. Accordingly, a new foster placement for A.A. was planned.

{¶ 14} Following the February 8, 2022 hearing, the parties and the GAL filed an agreed entry on February 14, 2022 which modified the case plan to allow for visitation between appellant and A.A. with the restriction that visitation occur only as facilitated and/or recommended by the family counselor. The agreed entry further statedvisitation could extend to unsupervised visitation if recommended by the family counselor. The juvenile court signed the entry permitting the parties' facilitation of visitation contingent on the preconditions set forth in the entry.

{¶ 15} On April 12, 2022, the GAL filed his fifth report. Therein, he reported, inter alia, that A.A. had recently moved to a new foster home and the GAL expected to visit him in the coming weeks. The GAL further reported that although appellant had successfully completed community control, she had not visited A.A. for two and one-half years. The GAL averred he did not believe appellant had ever expressed any desire to visit A.A. and that A.A. had very negative feelings toward appellant and did not want to see her.

{¶ 16} On April 19, 2022, the juvenile court held a pretrial hearing on the PCC motion. Appellant did not appear; her counsel attributed appellant's absence to counsel's failure to remind her of the hearing. The hearing primarily consisted of a discussion about establishing counseling services for A.A. Recognizing both the strained relationship between A.A. and appellant and A.A.'s resistance to counseling, the trial court determined

A.A. should attend individual counseling sessions before scheduling family counseling sessions with appellant.

{¶ 17} The GAL filed his sixth report on September 3, 2022. Therein, the GAL reported three visits with A.A. at his new foster home, with the latest held on September 2, 2022. The GAL further reported that although appellant had completed community control, she had not visited A.A. in over three years; the GAL understood that appellant had never expressed any desire to visit A.A. In addition, the GAL noted that A.A. harbored negative feelings about appellant and did not want to see her. According to the GAL, A.A. was very reluctant to engage in family counseling because he wanted a complete break from his entire family.

{¶ 18} On September 29, 2022, the juvenile court held a pre-trial hearing on the PCC motion. Counsel for FCCS reminded the court of FCCS' prior request, filed November 10, 2021, that the court conduct an in-camera interview of A.A. The court set a trial date for January 3, 2023 and indicated it would schedule an in-camera interview prior to trial. Counsel for appellant inquired about the possibility of appellant visiting with A.A. prior to trial. The juvenile court averred it would not force A.A. to visit appellant, but if A.A. was willing to do so, any visits would occur during counseling sessions.

{¶ 19} On December 24, 2022, the GAL filed his seventh report. The GAL averred he had investigated all matters related to A.A.'s best interest since being appointed GAL in September 2019. He further averred he had attended and participated in all court hearings and had attended the trial court's in-camera interview of A.A. on November 15, 2022. The GAL further asserted he had visited with A.A. on many occasions in A.A.'s foster homes and the residential treatment facility; his most recent visit with A.A. was in his new foster home in September 2022. His latest communication with A.A. was by telephone on December 24, 2022. The GAL reiterated the history of the criminal proceedings involving appellant which resulted in the imposition of the two-year no contact order. The GAL opined that had appellant requested a modification of the no contact order in coordination with the current juvenile court proceedings, such could have easily been accomplished. The GAL noted that despite having successfully completed her community control, appellant had not visited A.A. for over three years. The GAL reiterated that A.A. had consistently expressed no interest in seeing appellant, as he was convinced she hated him. The GAL averred that

family counseling had been suspended due to appellant's behavior and the counselors' opinions that the sessions were detrimental to A.A. The GAL opined that even if appellant was committed to reunifying with A.A., such would be difficult because appellant, as a single mother, has nine other minor children, including one autistic child with very high needs. Noting that three years had passed without any meaningful contact between appellant and A.A., the GAL opined that their relationship could not be repaired. The GAL further opined that A.A. needed permanence in his life.

{¶ 20} A trial on the PCC motion was held on January 3, 2023. At the outset, counsel for appellant requested a continuance based on appellant having notified counsel the previous afternoon that she was in an emergency room with flu symptoms. Counsel averred she had provided FCCS counsel with documentation obtained from appellant purporting to substantiate her claim. The parties agreed that appellant's documentation consisted only of two pieces of papers—one stating she was pregnant—the other providing general information about combatting the flu.[1] The juvenile court recessed the proceedings until 3:00 p.m. to allow time for appellant either to appear for trial or to provide physician-certified verification that she was presently hospitalized and unable to appear. When trial reconvened at 3:00 p.m., counsel for appellant asserted that appellant had not been admitted to the hospital; however, she could not attend the trial proceedings because she did not have child care. The juvenile court denied the continuance, noting appellant had ample time to make child care arrangements, as she had been notified of the trial date over three months prior to trial. The juvenile court further observed that A.A. had been in foster care for a significant period of time and that appellant was represented by competent counsel.

{¶ 21} Agata Kurtek, a child protection specialist supervisor for PFSN, testified on behalf of FCCS. Kurtek was assigned to A.A.'s case in May 2022. At the time of trial, A.A. was 12 years old.[2] According to Kurtek, FCCS obtained an emergency order of custody for A.A. on August 7, 2019, followed by a TOC on August 8, 2019. A.A. remained in the uninterrupted custody of FCCS from that date through the permanent custody hearing. In August 2019, appellant pled guilty to a charge of criminal mischief arising from her striking

---

[1] The two documents were admitted without objection as appellant's exhibit A and B.
[2] FCCS exhibit 1, admitted without objection, is a copy of A.A.'s birth certificate, listing his date of birth as March 25, 2010.

A.A. in the head with a cell phone.[3]  At the time of the permanent custody hearing, appellant had 10 children, including A.A.; 9 of the children were in her custody.

**{¶ 22}** Kurtek testified that pursuant to FCCS' case plan, appellant completed parenting classes through Buckeye Ranch; however, she continuously struggled to demonstrate her ability to communicate with A.A.  Appellant also completed a mental health assessment through Northland Community Center which resulted in a diagnosis of adjustment disorder with a recommendation for individual counseling.  Kurtek further testified appellant had been referred to various agencies for counseling services but had not participated in such services.

**{¶ 23}** Kurtek also testified that FCCS had previously been involved with one of A.A.'s siblings, a developmentally delayed child.  After achieving her case plan goals of engaging in services related to that child's special needs and visiting with the child, appellant and the child were reunified in August 2022.

**{¶ 24}** Kurtek also asserted that from the time the no contact order imposed in the criminal proceedings was lifted in August 2021 until January 2022, appellant consistently stated she did not want A.A. to return home.  She did not request reunification with A.A. until January 2022 and did not request visitation with A.A. until late summer 2022.  Kurtek further testified that appellant and A.A. participated in two family counseling sessions in September 2022.  According to Kurtek, no further sessions were scheduled because A.A.'s individual and family counselors determined it was in A.A.'s best interest not to have family

---

[3] FCCS exhibit 2, admitted without objection, are copies of the documentation related to the criminal proceedings against appellant in the Franklin County Municipal Court. That documentation established that in April 2019 appellant was charged with domestic violence, assault, and endangering children arising from an incident involving appellant striking A.A. in the head with a cell phone. On August 7, 2019, appellant entered a guilty plea to an amended charge of criminal mischief, a third-degree misdemeanor; the assault and endangering children charges were dismissed at the request of the state. Appellant was sentenced to a two-year term of community control on the condition that she not engage in any acts of violence and have no contact with A.A.

sessions with appellant.[4]  Kurtek testified that both counselors indicated they would be willing to re-engage in family counseling services, if appropriate, once appellant engaged in individual counseling services.  According to Kurtek, appellant was informed of this requirement; however, she never linked with any of the recommended counseling services.

{¶ 25} Kurtek testified she was concerned about appellant's consistent use of negative language in describing A.A., including referring to him as a liar, stating that he caused problems for the family, no one in the family wanted to take him, and he did not act like her other children. Kurtek further testified that A.A.'s maternal grandparents were not interested in obtaining custody of A.A.

{¶ 26} Kurtek also testified that A.A. was currently living in the foster home where he was placed in February 2022.  According to Kurtek, A.A. still had behavioral issues; however, his behavior had consistently improved as a result of weekly individual counseling sessions.  Kurtek conducted one home visit with A.A. and his foster mother.  Kurtek noted that A.A's attempts to "act out" during the visit were quickly thwarted by the foster mother, with whom A.A. seemed bonded.  (Jan. 3, 2023 Tr. at 29.)  Kurtek indicated the foster mother is interested in adopting A.A., with the only limitation being her financial circumstances.

---

[4] FCCS exhibits 3 and 4, admitted without objection, are letters from two different clinicians involved in A.A.'s case. Exhibit 3 is a September 28, 2022 letter from Kaitlynn Harrell, MSW, LSW, an outpatient behavioral therapist with National Youth Advocate Program, Inc. ("NYAP"). Harrell stated that she began individual psychotherapy with A.A. on April 18, 2022. Over the course of several months, A.A. responded positively to the therapy. However, when A.A. learned he was expected to participate in family therapy with appellant, he presented as dysregulated—crying and begging Harrell to stop the session from taking place. After meeting with appellant, A.A. presented with symptoms of trauma response such as irritability and increased anxiety; he also appeared to be insecure and more dependent on his foster mother to assist with communication, which he had not found necessary prior to the family sessions. Harrell further stated A.A. told her that during the family counseling session, appellant accused him of lying about his trauma history and included another family member in the session, which made him extremely uncomfortable. In Harrell's clinical opinion, continued family therapy sessions with appellant would be detrimental to A.A.

Exhibit 4 is a September 28, 2022 letter from NYAP therapist Amy Huffer, MS Ed., LPC. Huffer conducted two family therapy sessions with A.A., appellant, and A.A.'s foster mother. Huffer averred that from the outset, A.A. indicated he had no desire to speak to or see appellant and did not want to engage in therapy; A.A. had a traumatic response to the idea of having to do so. A.A. eventually agreed to engage in therapy only to "get it over with." During the sessions, appellant and A.A. talked over each other, only communicating their own desired outcomes. A.A. rejected appellant's suggestion that interaction with other family members during the therapy sessions might lead A.A. to want to come home. In fact, A.A. stated he did not want to see or speak to other family members; rather, he wanted to continue living in his foster home, as he was content and thriving both at home and school. NYAP ultimately concluded that continued family sessions would be detrimental to A.A.'s well-being; A.A. would continue his individual counseling sessions with a different therapist.

{¶ 27} Kurtek further testified that during one of A.A.'s family counseling sessions with appellant, which was held via teleconference, A.A. was able to view a few of his nine siblings. Beyond an initial greeting, A.A. did not converse with them and did not seem happy to see them. According to Kurtek, A.A. had never asked to visit his siblings.

{¶ 28} Kurtek concluded A.A. was in need of a legally secure permanent placement and recommended the juvenile court grant FCCS permanent custody of A.A. for purposes of adoption.

{¶ 29} On cross-examination, Kurtek acknowledged that appellant calling A.A. a liar was arguably accurate because A.A. had lied in the past. She also acknowledged that one of the family counselors did not allow a caseworker to observe the family session because A.A. did not want the caseworker to attend. She also acknowledged that one of the family counselors, in response to appellant's statement that A.A. did not have a choice with regard to seeing her, told appellant that A.A. had stated he did not want to see her. Kurtek disagreed with the suggestion by appellant's counsel that the counselor's action in this regard undermined the goal of reunification. Although Kurtek acknowledged that appellant was successfully parenting her other nine children and had requested reunification with A.A., she did not think appellant should be reunified with A.A. because she had not completed the services outlined in the case plan despite having had three years to do so. Kurtek also noted the unique circumstances involved in A.A.'s case, i.e., that criminal charges had been filed against appellant arising from her striking A.A. with her cell phone.

{¶ 30} The GAL, Worly, also testified on behalf of FCCS. He averred that over the past three and one-half years, he had consistently visited with A.A, both in A.A.'s foster homes and in the residential treatment facility in Cincinnati; he had also spoken to A.A. by telephone approximately six times. In addition, he had spoken to appellant, A.A.'s counselors, and foster parents, maintained contact with various caseworkers, and had obtained A.A.'s school records. The GAL further asserted he had observed A.A. interacting with his current foster mother. According to the GAL, A.A. was happy and doing well in his current foster home, was bonded with his foster mother, and was integrated into the family.

{¶ 31} The GAL described A.A. as a "very smart," "very inquisitive" "neat kid" with a good sense of humor. (Jan. 3, 2023 Tr. at 40.) The GAL noted that when A.A. was younger, he had a temper which sometimes resulted in fights with others, and he often used

inappropriate language; however, through the maturation process, A.A.'s behaviors had improved.

{¶ 32} The GAL testified he had never had an opportunity to observe A.A. interacting with appellant. He noted that his review of court records pertaining to appellant's municipal court criminal case revealed that appellant had never filed any motions or otherwise exerted any effort to have the no contact order lifted. The GAL averred that in his experience, "had [appellant] wanted that order lifted there was an easy route to get that done." (Jan. 3, 2023 Tr. at 42.) The GAL further asserted that A.A. had no contact with appellant from August 2019 to September 2022. During that time period, appellant informed the GAL that someone in her family might want A.A., but she did not. When appellant eventually expressed interest in seeing A.A., the GAL advised A.A. of appellant's assertion. A.A. told the GAL he had no desire to visit appellant, engage in counseling with her, or ever see her again. A.A. also told the GAL he had no interest in visiting with his siblings. Rather, he wanted to be adopted by his current foster mother. The GAL recommended the trial court grant FCCS' motion for PCC, as it was in A.A.'s best interest. On cross-examination, the GAL acknowledged that A.A., at times, had been untruthful and manipulated his previous foster parents.

{¶ 33} Thereafter, the trial court provided the GAL the opportunity to summarize the GAL report he filed on December 24, 2022.[5] To that end, the GAL asserted he had known A.A. for approximately three and one-half years; he described A.A. as a charming, gregarious, inquisitive boy who was eager to learn, love, and be loved. The GAL acknowledged experiencing periodic frustration with A.A.'s behaviors; however, at other times he "felt like crying" about A.A.'s circumstances, particularly when visiting A.A. in the residential treatment facility in Cincinnati. (Jan. 3, 2023 Tr. at 53.) The GAL noted that many of the other children in the treatment facility had significant mental health issues to which A.A. was exposed, and no one ever visited A.A. while he resided there.

{¶ 34} The GAL averred that the state of A.A.'s relationship with appellant at the time the juvenile case was opened, coupled with appellant not having had any contact with A.A. for three and one-half years, made it difficult to imagine their relationship could be repaired. He opined that appellant needed counseling to deal with A.A.'s behaviors, and

---

[5] GAL exhibit 1, the December 24, 2022 GAL report, was admitted without objection.

she failed him in not pursuing such services. The GAL further opined it was in A.A.'s best interest for FCCS to be granted permanent custody of A.A; in that event, FCCS should allow A.A. to remain in his current foster home and facilitate the foster mother's adoption of A.A.

{¶ 35} In a decision and judgment entry dated February 16, 2023, the juvenile court found by clear and convincing evidence that, pursuant to R.C. 2151.414(B)(1)(d), A.A. had been in FCCS' custody for 12 or more months out of a consecutive 22-month period, and on consideration of the factors set forth in R.C. 2151.414(D), awarding FCCS permanent custody of A.A. was in his best interest. Accordingly, the juvenile court granted FCCS' motion and committed A.A. to the permanent custody of FCCS.

## II. Assignment of Error

{¶ 36} Appellant appeals and assigns the following sole assignment of error for our review:

> Rule 48 was violated when the guardian ad litem did not observe the [A.A.] with [Appellant]. Thus, the court plainly erred when it entered the guardian ad litem's report into evidence and relied on the report for its findings.

## III. Discussion

{¶ 37} "The right to parent one's child is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution." *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 6. *See also In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("[T]he right to raise one's children is an 'essential' and 'basic civil right.' "). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). "Permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' Therefore, parents 'must be afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991).

{¶ 38} However, the state has broad authority to intervene to protect children from abuse and neglect. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28, citing R.C. 2151.01. An award of permanent custody, which terminates parental rights, is an " 'alternative of last resort and is only justified when it is necessary for the welfare of the children.' " *In re C.G.*,

10th Dist. No. 13AP-632, 2014-Ohio-279, ¶ 28, quoting *In re Swisher*, 10th Dist. No. 02AP-1408, 2003-Ohio-5446, ¶ 26.

{¶ 39} On appeal, a court of appeals will not reverse a juvenile court's determination that it was in the best interest of a child to grant a motion for permanent custody unless such determination is against the manifest weight of the evidence. *L.W.* at ¶ 8. The juvenile court's determination must be supported by clear and convincing evidence. R.C. 2151.414(B)(1). "Weight of the evidence concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." (Emphasis deleted.) (Internal quotations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). *See C.G.* at ¶ 31. Thus, in reviewing a judgment under the manifest weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost it way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Eastley* at ¶ 20.

{¶ 40} In conducting its review, a court of appeals must make every reasonable presumption in favor of the juvenile court's findings of fact and judgment. *L.W.* at ¶ 8; *Eastley* at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984), fn. 3. " '[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the trial court's verdict and judgment.' " *L.W.* at ¶ 8, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988). Moreover, a court of appeals must recognize that "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceedings and the impact the court's determination will have on the lives of the parties concerned." (Internal quotations omitted.) *In re W.D.*, 10th Dist. No. 09AP-589, 2009-Ohio-6903, ¶ 34, quoting *In re A.L.D.*, 10th Dist. No. 08AP-238, 2008-Ohio-3626, ¶ 8, quoting *In re Hogle*, 10th Dist. No. 99AP-944 (June 27, 2000).

**{¶ 41}** In her sole assignment of error, appellant argues the juvenile court plainly erred in admitting into evidence the GAL's report and relying on that report in its findings. Appellant specifically contends the GAL violated Sup.R. 48.03(D) by not observing A.A. with appellant.

**{¶ 42}** Preliminarily, we note that appellant failed to object to the admission of the GAL's report and, therefore, as appellant concedes, has forfeited all but plain error.[6] *In re D.E.*, 10th Dist. No. 20AP-83, 2021-Ohio-524, ¶ 76, citing *L.W.* at ¶ 36; *In re West*, 4th Dist. No. 05CA4, 2005-Ohio-2977, ¶ 25. " 'In civil cases, the plain error doctrine is not favored and may only be applied in the extremely rare case involving exceptional circumstances such that the error, if left uncorrected, would challenge the fairness, integrity, or public reputation of the judicial process itself.' " *D.E.* at ¶ 76, quoting *Brisco v. U.S. Restoration & Remodeling, Inc.*, 10th Dist. No. 18AP-109, 2019-Ohio-5318, ¶ 25. "Because parental rights determinations are difficult to make and appellate courts accord wide latitude to the trial court's consideration of evidence in these cases, [p]lain error is particularly difficult to establish." (Internal quotations omitted.) *Id.*, quoting *Hamilton v. Hamilton*, 10th Dist. No. 14AP-1061, 2016-Ohio-5900, ¶ 8, quoting *Faulks v. Flynn*, 4th Dist. No. 13CA3568, 2014-Ohio-1610, ¶ 20, quoting *Robinette v. Bryant*, 4th Dist. No. 12CA20, 2013-Ohio-2889, ¶ 28.

**{¶ 43}** A juvenile court must appoint a GAL to protect the interest of a child in any proceeding concerning an abused or neglected child and in any proceeding for permanent custody held pursuant to R.C. 2151.414. R.C. 2151.281(B). The GAL must "perform whatever functions are necessary to protect the best interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services provided the child" by a public children services agency that has custody of the child and shall file any motions and other court papers that are in the best interest of the child. R.C. 2151.281(I). If the GAL "fail[s] to faithfully discharge the guardian ad litem's duties," the court must discharge the GAL and appoint another GAL. R.C. 2151.281(D).

**{¶ 44}** Here, appellant does not contend the trial court erred in failing to discharge the GAL under R.C. 2151.281(D), nor does she argue the trial court erred in admitting the

---

[6] The juvenile court noted in its decision and judgment entry that "[n]o objections were made by any party to the manner which the Guardian filed reports or offered testimony." (Feb. 16, 2023 Decision & Jgmt. Entry at 5.)

testimony of the GAL. Rather, appellant maintains the trial court should have excluded the GAL's report and not relied on it in its findings because the GAL failed to perform one of the duties outlined in the Supreme Court of Ohio's Rules of Superintendence.

{¶ 45} "Article IV, Section 5(A)(1) of the Ohio Constitution provides the Supreme Court of Ohio with general superintendence over all the courts in the state." *In re A.S.*, 10th Dist. No. 21AP-249, 2022-Ohio-1861, ¶ 51. "In accordance with this authority, the Supreme Court originated the Rules of Superintendence for the Courts of Ohio, including the courts of common pleas and the divisions thereof." *Id.*, citing Sup.R. 1; *Arlington Bank v. Bee, Inc.*, 10th Dist. No. 10AP-41, 2010-Ohio-6040, ¶ 16; *D.E.* at ¶ 72. The Rules of Superintendence contain certain specified provisions that apply in domestic relations and juvenile court cases where the court appoints a GAL. *A.S.* at ¶ 51.

{¶ 46} The Rules of Superintendence provide a non-exhaustive list of duties GALs are required to perform. *Id.* at ¶ 52. Former Sup.R. 48(D), in effect when the GAL was appointed in this case in 2019, provided:

> In order to provide the court with relevant information and an informed recommendation regarding the child's best interest, a guardian ad litem shall perform, at a minimum, the following responsibilities stated in this division, unless impracticable or inadvisable to do so:
>
> * * *
>
> (13) A guardian ad litem shall make reasonable efforts to become informed about the facts of the case and to contact all parties. In order to provide the court with relevant information and an informed recommendation as to the child's best interest, a guardian ad litem shall, at a minimum, do the following, unless impracticable or inadvisable because of the age of the child or the specific circumstances of a particular case:
>
> (a) Meet with and interview the child and *observe the child with each parent*, foster parent, guardian or physical custodian and conduct at least one interview with the child where none of these individuals is present;
>
> (b) Visit the child at his or her residence in accordance with any standards established by the court in which the guardian ad litem is appointed;

(c) Ascertain the wishes of the child;

(d) Meet with and interview the parties, foster parents and other significant individuals who may have relevant knowledge regarding the issues of the case;

(e) Review pleadings and other relevant court documents in the case in which the guardian ad litem is appointed;

(f) Review criminal, civil, educational and administrative records pertaining to the child and, if appropriate, to the child's family or to other parties in the case;

(g) Interview school personnel, medical and mental health providers, child protective services workers and relevant court personnel and obtain copies of relevant records;

(h) Recommend that the court order psychological evaluations, mental health and/or substance abuse assessments, or other evaluations or tests of the parties as the guardian ad litem deems necessary or helpful to the court; and

(i) Perform any other investigation necessary to make an informed recommendation regarding the best interest of the child.

(Emphasis added.) *In re R.P.*, 10th Dist. No. 20AP-538, 2021-Ohio-4065, ¶ 30; *A.S.* at ¶ 52.

{¶ 47} The Rules of Superintendence were amended effective January 1, 2021. *A.S.* at ¶ 51. Sup.R. 48.03(D), in effect when the GAL prepared and filed his final GAL report and summarized its contents at the permanent custody hearing, and which appellant claims the GAL violated, provides the following with respect to the duties of a GAL:

*Unless specifically relieved by the court*, the duties of a guardian ad litem shall include, but are not limited to, the following:

(1) Become informed about the facts of the case and contact all relevant persons;

(2) *Observe the child with each parent*, foster parent, guardian or physical custodian;

(3) Interview the child, if age and developmentally appropriate, where no parent, foster parent, guardian, or physical custodian is present;

(4) Visit the child at the residence or proposed residence of the child in accordance with any standards established by the court;

(5) Ascertain the wishes and concerns of the child;

(6) Interview the parties, foster parents, guardians, physical custodian, and other significant individuals who may have relevant knowledge regarding the issues of the case. The guardian ad litem may require each individual to be interviewed without the presence of others. Upon request of the individual, the attorney for the individual may be present.

(7) Interview relevant school personnel, medical and mental health providers, child protective services workers, and court personnel and obtain copies of relevant records;

(8) Review pleadings and other relevant court documents in the case;

(9) Obtain and review relevant criminal, civil, educational, mental health, medical, and administrative records pertaining to the child and, if appropriate, the family of the child or other parties in the case;

(10) Request that the court order psychological evaluations, mental health or substance abuse assessments, or other evaluations or tests of the parties as the guardian ad litem deems necessary or helpful to the court;

(11) Review any necessary information and interview other persons as necessary to make an informed recommendation regarding the best interest of the child.

(Emphasis sic; emphasis added.)  *A.S.* at ¶ 52.


**{¶ 48}** As we recognized in *A.S.*, this court has "previously noted that '[s]ignificant changes were made' in the January 1, 2021 amendments to the Rules of Superintendence governing GALs, 'including the deletion of the GAL's discretion to not perform duties "unless impracticable or inadvisable" and to "make reasonable efforts" to perform the duties.' "  *Id.* at ¶ 51, fn. 10, quoting *D.E.* at ¶ 73, fn. 15.  We further noted in *A.S.* that "the amended rules, in addition to imposing 'different and additional requirements,' now also 'provide the GAL shall perform the duties "[u]nless specifically relieved by the court,"

thereby giving the discretion to the court, not the GAL, to determine when it is impracticable or inadvisable to not perform duties and whether the GAL has engaged in reasonable efforts to perform the duties.' " *Id.* at ¶ 51, fn. 10.

{¶ 49} In this case, the GAL was required to comply with the prior version of the Rules of Superintendence from the time of his appointment in September 2019 until January 1, 2021, after which he was required to comply with the amended rules. *Id.* at ¶ 51, fn. 10; ¶ 56. "[U]nder both the present and former versions of the Rules of Superintendence, the rules mandated that the provisions related to GALs 'shall apply in all domestic relations and juvenile cases in the courts of common pleas where a court appoints a guardian ad litem' for the child." *Id.* at ¶ 51, fn. 11.

{¶ 50} As stated above, appellant's argument that the trial court should have excluded the GAL's report for failure to observe appellant and A.A. together is premised on her contention that the GAL failed to comply with amended Sup.R. 48.03(D)(2), which requires the GAL to "[o]bserve the child with each parent." We note that former Sup.R. 48(D)(13)(a) includes the identical directive. This court has consistently observed, however, that "[t]he Rules of Superintendence are internal housekeeping rules that create no substantive individual rights." *R.P.* at ¶ 31, citing *D.E.* at ¶ 77; *In re S.S.*, 10th Dist. No. 17AP-681, 2018-Ohio-1249, ¶ 11. Moreover, "[b]ecause Sup.R. 48 is a general guideline that lacks the force of statutory law, noncompliance with Sup.R. 48(D) is not grounds for automatic exclusion of a [GAL's] report, testimony, or recommendation." *R.P.* at ¶ 31. Rather, a juvenile court "may exercise its discretion to consider that evidence." *Id.*, citing *In re N.B.*, 8th Dist. No. 105028, 2017-Ohio-1376, ¶ 26.

{¶ 51} While appellant contends the GAL failed to perform his duty of observing her with A.A. (the GAL having acknowledged during his trial testimony that he did not observe a visit between A.A. and appellant), the record establishes because of the unique circumstances in this case, the GAL had little, if any, opportunity to do so. As noted above, appellant's criminal conviction in August 2019 resulted in a court order that appellant have no contact with A.A. for two years; accordingly, appellant's case plan did not allow for visitation between A.A. and appellant during that two-year period. No evidence in the record establishes that appellant made any effort toward having the no contact order lifted prior to its expiration in August 2021. Further, evidence in the record establishes that

appellant did not request reunification with A.A. until January 2022 and did not request visitation with A.A. until late summer 2022; both were well after the no contact order expired. In addition, the February 2022 agreed entry permitting visitation between appellant and A.A. restricted such visitation to family counseling sessions only. Appellant argues the GAL "could have" observed A.A. and appellant during the counseling sessions. (Appellant's Brief at 13.) However, appellant does not direct this court to any evidence supporting that assertion. There is no indication in either the February 2022 agreed entry or at the hearing preceding and precipitating the filing of the agreed entry that the GAL was permitted to attend the family counseling sessions. Further, the record establishes that only two family counseling sessions occurred, after which A.A.'s counselors recommended that further family counseling sessions would be detrimental to A.A.

{¶ 52} In addition, appellant's reliance on this court's decision in *A.S.* is without merit, as the facts in the present case are distinguishable from those in *A.S.* Here, the removal of A.A. from appellant's custody derived from her criminal actions in striking A.A. with her cell phone. As a result, appellant was judicially ordered to have no contact with A.A. for two years. It is evident from the record that the juvenile court was aware of the criminal proceedings against appellant, including the judicially imposed two-year no contact order, as well as appellant's lack of effort to have that order lifted or to initiate visitation with A.A. as soon as practicable after the no contact order expired. The record also makes clear that the juvenile court was mindful of A.A.'s consistent articulation that he did not want to visit appellant as well as A.A.'s traumatic reaction to the family counseling sessions he attended with appellant.

{¶ 53} Moreover, in *A.S.* we held that "under the facts and circumstances present in this case, * * * the juvenile court committed plain error under R.C. 2151.281(D) in not requiring the GAL to faithfully discharge his duties and in not discharging the GAL and appointing a new GAL for failure to faithfully discharge GAL duties, as well as in admitting the GAL's report and testimony." *Id.* at ¶ 75. The record in *A.S.* revealed multiple deficiencies by the GAL in performing his duties well beyond the GAL's failure to observe A.S. at a visitation with either of his parents. Specifically, we noted the GAL "appear[ed] not to have been informed about many important facts of the case," including the GAL's error in stating in his final report that there had been no genetic testing of A.S.'s father when

FCCS' exhibits at the permanent custody hearing established that A.S.'s father had established paternity via genetic testing nearly two years before the permanent custody hearing and the GAL's final report. *Id*. at ¶ 57. We further observed the GAL visited A.S. only once, via videoconference, over the three-year period from the time of A.S.'s removal to the permanent custody hearing. *Id*. at ¶ 59, 75. We also noted the GAL failed to ascertain A.S.'s wishes, concerns, or bonds with his biological parents. *Id*. at ¶ 61. In addition, we noted the GAL had not observed the child's interaction with both foster parents and that the GAL had not communicated with any of A.S.'s school personnel or healthcare providers. *Id*. at ¶ 63, 64. We also averred it appeared the GAL's report and testimony were based on the "mere handful" of times he interacted with some of the relevant parties and that he based his opinion at the permanent custody hearing in part on testimony he heard at the hearing itself. *Id*. at ¶ 70. We concluded that *A.S.* was the "extremely rare case" in which the GAL so completely failed to discharge his responsibilities that he did not act in the best interest of the children and the juvenile court plainly erred by failing to discharge and replace the GAL and in admitting the testimony and report of the GAL. *Id*. at ¶ 54, 75.

{¶ 54} By contrast, in the present case, as outlined above, the record confirms the many and varied duties performed by the GAL over the three and one-half years he was involved with A.A.'s case. The GAL interacted with A.A. on numerous occasions, both in person in A.A.'s foster homes and residential treatment facility placements and by telephone. During those interactions, the GAL ascertained A.A.'s wishes and concerns, i.e., that A.A. had no desire to visit appellant or his siblings, engage in counseling with appellant, or ever see her again; rather, he wanted to remain in his current foster home and be adopted by his foster mother. The GAL also communicated with A.A.'s past and present foster parents, communicated with A.A.'s caseworkers and counselors, and observed A.A. with his current foster mother. In addition, the GAL reviewed the court documents related to the criminal proceedings against appellant which prompted the present juvenile court proceedings. The GAL also attended all the juvenile court hearings related to A.A. and filed seven reports documenting his investigation of A.A.'s case. Further, there is no indication the GAL based his opinion at the permanent custody hearing on testimony he heard at the hearing itself; rather, the GAL appears to have based his opinion on his independent investigation of the facts of the case. In short, we find no evidence that the GAL was

deficient in the performance of his duties comparable to the extent of the deficiencies of the GAL in *A.S.*

{¶ 55} As noted above, neither former nor present Sup.R. 48 create "substantive individual rights." *R.P.* at ¶ 31. Further, " 'the trial court, as the trier of fact, is permitted to assign weight to the GAL's testimony and recommendation and to consider it in the context of all the evidence before the court,' and '[t]he decision of whether to consider a GAL report, even when the [GAL] did not fully comply with Superintendence Rule 48, is within a trial court's discretion.' " *In re B.T.*, 10th Dist. No. 21AP-485, 2022-Ohio-4093, ¶ 38, quoting *In re K.A.*, 5th Dist. No. 2021 CA 00002, 2021-Ohio-1772, ¶ 59. Although the juvenile court did not specifically mention the GAL's failure to observe appellant with A.A. in its judgment, such was brought to the attention of the court through the GAL's direct examination. A.A. was represented by counsel who was separate from the GAL, and counsel had the opportunity to cross-examine the GAL. Thus, the trial court was aware of the alleged deficiency in the GAL's investigation and exercised its discretion when deciding whether to consider the GAL's report. Accordingly, we find no error, plain or otherwise, in the juvenile court's admission of the GAL's report and reliance on the report in its findings.

{¶ 56} Moreover, even if the juvenile court erred in admitting the GAL's report due to the GAL's failure to comply with one of the duties set forth in the Rules of Superintendence, this case is not the "rare circumstance" in which such failure alone should result in reversal. *D.E.* at ¶ 92. Here, FCCS presented clear and convincing evidence that granting the motion for permanent custody was in the best interest of A.A. In determining that permanent custody to FCCS was in A.A.'s best interest, the juvenile court relied not only on the GAL's report, but also on the testimony provided by Kurtek, the court's own observations of A.A. during the in-camera interview, and the testimony provided by the GAL. As noted above, appellant does not specifically challenge the juvenile court's admission of the GAL's testimony. Thus, the juvenile court's admission of the GAL's report did not affect the outcome of the trial. *In re D.K.*, 10th Dist. No. 19AP-801, 2020-Ohio-5251, ¶ 40, quoting *In re J.L.*, 10th Dist. No. 15AP-889, 2016-Ohio-2858, ¶ 60, quoting *In re C.C.*, 10th Dist. No. 04AP-883, 2005-Ohio-5163, ¶ 27 (considering plain error in a civil case, including a permanent custody case, "[a]n error is prejudicial if it impacted the party's substantial rights by affecting the outcome of the trial"). (Internal quotations omitted.)

{¶ 57} For the foregoing reasons, appellant's assignment of error is overruled.

**IV. Conclusion**

{¶ 58} Having overruled appellant's sole assignment of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

LUPER SCHUSTER and LELAND, JJ., concur.

———————————