[Cite as *In re C.W.*, 2025-Ohio-282.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| C.W. III, | : | No. 24AP-38 |
| | | (C.P.C. No. 20JU-5593) |
| (G.R., Mother, | : | |
| | | (REGULAR CALENDAR) |
| Appellant). | : | |
| In the Matter of: | : | |
| C.W. III, | : | No. 24AP-88 |
| | | (C.P.C. No. 20JU-5593) |
| (C.W., Father, | : | |
| | | (REGULAR CALENDAR) |
| Appellant). | : | |

D E C I S I O N

Rendered on January 30, 2025

**On brief:** *Alana Van Gundy* for appellant G.R.

**On brief:** *Mitchell A. Williams*, Public Defender, and *George M. Schumann* for appellant C.W.

**On brief:** *Tyler W. Dunham* for Franklin County Children Services.

APPEALS from the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch

EDELSTEIN, J.

{¶ 1} In these consolidated cases, appellants, G.R., mother of C.W. III, and C.W., father of C.W. III, appeal from a decision and judgment entry of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, terminating their

parental rights and placing C.W. III in the permanent custody of appellee, Franklin County Children Services ("FCCS"). For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} This case involves FCCS's request for permanent custody of C.W. III, who was born on July 14, 2020. FCCS filed a complaint on August 5, 2020, when C.W. III was approximately three weeks old, alleging C.W. III to be an abused, neglected, and dependent child. FCCS stated in the complaint that mother has three other children not in her care. Of mother's three other children, two are in the permanent custody of FCCS due to concerns of homelessness, domestic violence, and substance abuse. The third child is in the legal custody of a relative. The complaint alleged both mother and C.W. III tested positive for cocaine, benzodiazepines, and fentanyl shortly after C.W. III's birth. According to the complaint, mother is married to A.R. who, at the time of C.W. III's birth, was incarcerated for convictions of robbery and aggravated robbery. The same day it filed the complaint, FCCS obtained an emergency custody order.

{¶ 3} The trial court issued a temporary order of custody to FCCS on August 6, 2020. At an October 28, 2020 hearing, the trial court found C.W. III to be an abused and dependent child and awarded temporary court commitment to FCCS. (Oct. 28, 2020 Tr. at 11-12.) Thereafter, the trial court approved and adopted a case plan for mother, father, and A.R.

{¶ 4} Following two extensions of temporary court commitment, the first in August 2021 and the second in February 2022, FCCS filed a motion for permanent court commitment ("PCC") of C.W. III on May 19, 2022. The trial court granted several continuances of the PCC proceedings. First, on July 26, 2022, the trial court granted FCCS's motion for a continuance to perfect service. The trial court then granted, on October 5, 2022, FCCS's motion for an additional continuance to obtain C.W. III's birth certificate. After a pretrial hearing on February 7, 2023, the trial court scheduled the matter for a full trial on July 19, 2023. On the scheduled July 19, 2023 trial date, the trial court granted a third continuance at FCCS's request due to the involvement of counsel for FCCS in another ongoing trial. The trial court granted a fourth continuance on September 1, 2023, though

the record is not clear as to which party requested the continuance, scheduling trial for September 11, 2023.

{¶ 5} Ultimately, the matter came for trial on September 11, 2023. Counsel for mother and father jointly moved for a continuance. (Sept. 11, 2023 Tr. at 6-8.) Mother asked for additional time to work with the newly assigned caseworker toward reunification with C.W. III and to continue participation in a methadone program. (Sept. 11, 2023 Tr. at 6-7.) The trial court denied mother's and father's requests for a continuance and proceeded to trial, finding it was in the child's best interest to proceed with the trial given the length of time C.W. III had been in the custody of FCCS. (Sept. 11, 2023 Tr. at 11.)

{¶ 6} The trial occurred over two days. Initially, both mother and father were present for trial, though mother exited the courtroom during the opening statement from FCCS. (Sept. 11, 2023 Tr. at 5-6, 13-14.) Counsel for mother was unable to make contact with her, and mother did not return during the remainder of the proceedings that day. (Sept. 11, 2023 Tr. at 14.) The trial resumed for the second and final day on November 2, 2023. Father was present for the hearing, but mother was not. (Nov. 2, 2023 Tr. at 7, 19.) Counsel for mother stated she was unsure of mother's whereabouts and indicated she had left two voicemail messages for mother. (Nov. 2, 2023 Tr. at 7.) Mother did arrive while the hearing was underway but left during a recess and did not return. (Nov. 2, 2023 Tr. at 25, 133.)

{¶ 7} During the trial, the parties stipulated that mother had two other children placed in the permanent custody of FCCS. (Sept. 11, 2023 Tr. at 17; Ex. 3.) Father testified he has another son currently in the custody of his sister. (Sept. 11, 2023 Tr. at 20, 32-33.) At the time of trial, father testified he was living with his mother but that he planned to be in his own apartment in the next month. (Sept. 11, 2023 Tr. at 21.) Father did not have a specific apartment or apartment complex identified for his future housing, but he stated C.W. III would be able to live with him at his mother's home and they would share a bedroom. (Sept. 11, 2023 Tr. at 21, 24.) However, father said he had not scheduled a home visit with the caseworker or the guardian ad litem to inspect his current residence, nor did he provide them with his current address. (Sept. 11, 2023 Tr. at 22, 34.) Father testified he had been employed at a restaurant since April 2023 where he worked 40 or more hours a week at a rate of $15.50 per hour. (Sept. 11, 2023 Tr. at 24-25.)

{¶ 8}    Father testified he had not completed any alcohol or drug assessments with any providers in the last three years and he had only completed two drug screens, both of which were positive for marijuana. (Sept. 11, 2023 Tr. at 25-26, 35.) He said he was unable to complete more drug screens due to conflicts with his job. (Sept. 11, 2023 Tr. at 26.) Additionally, father admitted to using marijuana. (Sept. 11, 2023 Tr. at 26-27.) He acknowledged that completing an alcohol and drug assessment was a goal of his case plan, but he stated he had not had time to do so. (Sept. 11, 2023 Tr. at 35.)

{¶ 9}    Father testified he resumed visits with C.W. III in May of 2023 after not having visited C.W. III at all since December of 2020. (Sept. 11, 2023 Tr. at 28-29.) Though he agreed he had missed some visits with C.W. III since May 2023, father alleged the missed visits were attributable to other parties cancelling the visits. (Sept. 11, 2023 Tr. at 28-29.) Father described C.W. III as exhibiting "normal" behavior and did not see signs of any "problems" of which FCCS had informed him. (Sept. 11, 2023 Tr. at 29.) Though father agreed the guardian ad litem had made him aware of C.W. III's medical needs "to an extent," he testified he did not inquire further about those medical needs, nor did he attend or ask to attend any medical appointments for C.W. III. (Sept. 11, 2023 Tr. at 35.) When asked how he would provide childcare to C.W. III while he is at work, father testified he would rely on family members or find a daycare provider. (Sept. 11, 2023 Tr. at 31.) Father said he had not looked for any potential daycare providers yet because C.W. III was not in his care and he was unaware that was something he should have done as a step toward reunification. (Sept. 11, 2023 Tr. at 31.)

{¶ 10} The FCCS caseworker previously assigned to the matter, Kristie Marshall, testified FCCS became involved with C.W. III at birth after both mother and C.W. III tested positive for benzodiazepines, cocaine, and fentanyl. (Sept. 11, 2023 Tr. at 37.) Ms. Marshall testified C.W. III has been in the custody of FCCS since August 5, 2020. (Sept. 11, 2023 Tr. at 39.)

{¶ 11} As part of the case plan developed by the trial court, Ms. Marshall stated mother was required to complete a drug and alcohol assessment and follow the recommendations from providers, complete random urine screens, obtain a legal source of income, maintain stable housing, and meet monthly with the FCCS caseworker. (Sept. 11, 2023 Tr. at 40.) Ms. Marshall testified mother had not completed the alcohol and drug

assessment and that mother admits to continued drug use. (Sept. 11, 2023 Tr. at 40-41.) FCCS has provided referral resources for treatment services and bus passes for mother to complete drug screens or attend services, but Ms. Marshall said mother has declined those resources. (Sept. 11, 2023 Tr. at 41.) Mother did sign a release for the methadone clinic she attended for six months, but Ms. Marshall testified mother is no longer attending the methadone clinic due to reported "car problems." (Sept. 11, 2023 Tr. at 42-43.) Further, Ms. Marshall testified mother's housing and income situation is "unstable," noting mother does not have independent housing and has not reported an income other than stating she works "under the table" at a bar. (Sept. 11, 2023 Tr. at 41.)

{¶ 12} Ms. Marshall testified she was assigned to the case in October of 2021 but mother did not meet with her until September of 2022 when mother showed up after a court hearing. (Sept. 11, 2023 Tr. at 42.) Mother then attended meetings "very inconsistent[ly]" from September 2022 to April 2023, at which time FCCS initiated visits at the agency. (Sept. 11, 2023 Tr. at 42.)

{¶ 13} As to A.R., mother's husband, Ms. Marshall testified he was incarcerated when she first became involved in the case but was released from prison in October 2022. (Sept. 11, 2023 Tr. at 43-44.) Though A.R. had a case plan objective to write to C.W. III and the caseworker, Ms. Marshall testified A.R. has never written to C.W. III or had any contact with him. (Sept. 11, 2023 Tr. at 44.) Additionally, A.R. has not had any contact with FCCS since his release from prison despite the agency's attempts to locate him. (Sept. 11, 2023 Tr. at 44-45.)

{¶ 14} Ms. Marshall also testified regarding father's case plan objectives. (Sept. 11, 2023 Tr. at 45.) The case plan required father to complete a drug and alcohol assessment and follow through with any recommendations, complete random drug screens, obtain stable housing and a legal source of income, and establish a relationship with C.W. III. (Sept. 11, 2023 Tr. at 45.) Ms. Marshall testified father has not completed the drug and alcohol assessment and only completed two drug screens during the pendency of the case. (Sept. 11, 2023 Tr. at 45.) Ms. Marshall said she has discussed with father the importance of stopping his marijuana use. (Sept. 11, 2023 Tr. at 46.)

{¶ 15} Ms. Marshall described father's efforts to obtain stable housing and income as "[i]nsufficient," noting that father does not have independent housing and did not

provide paystubs to verify his employment until the day of the trial. (Sept. 11, 2023 Tr. at 47.) She testified that although the case plan does not formally require father to have independent housing, living with other people results in less stable housing and frequent housing changes—changes father has previously failed to report to FCCS. (Sept. 11, 2023 Tr. at 47.) Once Ms. Marshall became aware of father's whereabouts, she said father has been consistent in attending meetings with her once a month when asked. (Sept. 11, 2023 Tr. at 47.) Ms. Marshall testified father's whereabouts were unknown prior to November 2022. (Sept. 11, 2023 Tr. at 48.)

{¶ 16} Further, Ms. Marshall testified both mother and father were offered weekly, supervised visits from the time the case first opened but mother and father initially attended visits inconsistently. (Sept. 11, 2023 Tr. at 50-51.) In December 2020, FCCS stopped the scheduled visits after repeated "no call-no shows" from both mother and father. (Sept. 11, 2023 Tr. at 51.) FCCS kept the visitations on the schedule until March 2021 but then removed the visits from the calendar as both mother's and father's whereabouts were unknown. (Sept. 11, 2023 Tr. at 51.) Neither mother nor father had any contact with C.W. III in 2021 or 2022. (Nov. 2, 2023 Tr. at 15.) After a February 2023 hearing, FCCS reestablished a visitation schedule that began in April 2023. (Sept. 11, 2023 Tr. at 51.)

{¶ 17} When father did attend visits with C.W. III after FCCS was able to reengage contact with him, Ms. Marshall described father as putting forth effort to interact with C.W. III and behaving appropriately. (Sept. 11, 2023 Tr. at 49.) Since April 2023, Ms. Marshall said mother's and father's attendance at the scheduled visits has been inconsistent. (Sept. 11, 2023 Tr. at 52.)

{¶ 18} Ms. Marshall described C.W. III as friendly with everyone he interacts with, including when he visits with mother and father. (Sept. 11, 2023 Tr. at 56.) Ms. Marshall said mother and father are both appropriate in their interactions with C.W. III, often brining him snacks and toys. (Sept. 11, 2023 Tr. at 56.) However, Ms. Marshall testified she would not describe C.W. III as especially bonded to mother or father, explaining he interacts with them the way he interacts with everyone. (Sept. 11, 2023 Tr. at 56-57.)

{¶ 19} Ms. Marshall described C.W. III as "extremely bonded" to his foster parents, openly expressing affection for them and going to them for his needs. (Sept. 11, 2023 Tr. at

57.)  Ms. Marshall said C.W. III also has a significant bond with the other child in the foster home.  (Sept. 11, 2023 Tr. at 58.)  C.W. III's current foster family is a licensed foster-to-adopt home, and Ms. Marshall testified the foster parents are interested in adopting C.W. III.  (Sept. 11, 2023 Tr. at 58.)

{¶ 20}  Additionally, Ms. Marshall testified regarding C.W. III's medical needs, stating he has been diagnosed with a genetic disorder that causes him to be more prone to physical and developmental delays.  (Sept. 11, 2023 Tr. at 58.)  Ms. Marshall stated C.W. III currently receives occupational therapy, physical therapy, speech therapy, and feeding therapy.  (Sept. 11, 2023 Tr. at 58-59.)  C.W. III previously attended a special needs preschool and, at the time of trial, was enrolled in a preschool that is able to meet his special needs.  (Sept. 11, 2023 Tr. at 59.)

{¶ 21}  Ms. Marshall testified FCCS completed two home studies of relatives for potential kinship placement, but the agency did not approve either request.  (Sept. 11, 2023 Tr. at 55.)  Further, she testified C.W. III is in need of a legally secure and permanent placement and that it was the recommendation of FCCS to grant the motion for permanent custody.  (Sept. 11, 2023 Tr. at 59.)

{¶ 22}  FCCS assigned a new caseworker to the matter on September 8, 2023.  (Nov. 2, 2023 Tr. at 18.)  Shanice Larde, the ongoing FCCS caseworker, testified that since October 10, 2023, mother has completed 5 of a possible 12 drug screens, 3 of which were positive for cocaine.  (Nov. 2, 2023 Tr. at 20, 22, 35.)  Ms. Larde testified mother has not completed any drug and alcohol assessments or any type of parenting program since Ms. Larde became involved in the case.  (Nov. 2, 2023 Tr. at 22.)  Though mother is not employed, Ms. Larde said mother reported that she has a house, and FCCS provided mother a referral to get furniture through a furniture bank.  (Nov. 2, 2023 Tr. at 23.)  Ms. Larde said she had been unable to visit mother's home since the time she became involved in the matter, indicating she and mother have had difficulty connecting by phone.  (Nov. 2, 2023 Tr. at 33.)  However, Ms. Larde testified mother has attended visits regularly with C.W. III at the agency from October 9, 2023 until the November 2, 2023 hearing date.  (Nov. 2, 2023 Tr. at 23.)

{¶ 23}  Ms. Larde testified father completed one drug screen in September 2023 that was positive for marijuana and then missed a second drug screen.  (Nov. 2, 2023 Tr. at 25.)

Father continued to live with his mother but reported to Ms. Larde that he was making efforts to obtain stable housing. (Nov. 2, 2023 Tr. at 25-26.) Ms. Larde described father as compliant with the scheduled visits with C.W. III, noting he only missed one visit since she became involved in the case. (Nov. 2, 2023 Tr. at 26.) During the hearing, counsel for father stated father had just provided counsel with a lease for new housing. (Nov. 2, 2023 Tr. at 41.) Prior to the start of the hearing on November 2, 2023, however, Ms. Larde said father had reported only that he had found a place but was waiting on further information from the landlord. (Nov. 2, 2023 Tr. at 41.)

{¶ 24} Describing mother's and father's visits with C.W. III, Ms. Larde testified both mother and father are appropriate with C.W. III and interact well with him. (Nov. 2, 2023 Tr. at 27.) When asked whether C.W. III is bonded to mother or father, Ms. Larde said C.W. III "is aware of who they are and comfortable with them." (Nov. 2, 2023 Tr. at 28.) Ms. Larde also observed C.W. III with his current foster caregivers and described C.W. III as bonded to both foster parents, noting he follows them around and does not want to be away from them. (Nov. 2, 2023 Tr. at 28.) Ms. Larde testified C.W. III is in need of a legally secure and permanent placement, and she stated FCCS recommends granting permanent custody to achieve that legally secure and permanent placement. (Nov. 2, 2023 Tr. at 28-29.)

{¶ 25} Father testified again at the November 2, 2023 hearing and stated he had not used marijuana for nearly a month. (Nov. 2, 2023 Tr. at 50-51.) He stated he stopped using marijuana in an effort to be reunited with C.W. III. (Nov. 2, 2023 Tr. at 51.) Father further testified he just signed a lease for his own apartment and would be moving into it in the next week. (Nov. 2, 2023 Tr. at 51-52.) Additionally, father stated he is "aware of what they say" are C.W. III's special needs, but he said he had not observed anything in C.W. III consistent with what he had been told. (Nov. 2, 2023 Tr. at 54-55.) Father said he would continue to take C.W. III to a specialist if it was recommended and C.W. III were under his care. (Nov. 2, 2023 Tr. at 55-56.) Father testified he did not know C.W. III's actual diagnosis related to his special needs. (Nov. 2, 2023 Tr. at 74-75.)

{¶ 26} The final witness at the trial was Elizabeth Weinstein, the guardian ad litem for C.W. III. (Nov. 2, 2023 Tr. at 83.) The guardian ad litem testified she became involved in the case in June 2021. (Nov. 2, 2023 Tr. at 84.) After reviewing pleadings and court

documents, obtaining and reviewing necessary records and information, and interviewing all necessary individuals, she filed a report for C.W. III. (Nov. 2, 2023 Tr. at 85.) The guardian ad litem testified C.W. III was born addicted to drugs and with a genetic disorder that causes low muscle tone and impacts cognitive development, physical development, speech, language, and behavioral issues. (Nov. 2, 2023 Tr. at 87.) The guardian ad litem testified she had consistent and frequent contact with the foster parents and had visited C.W. III with his foster family at their home several times. (Nov. 2, 2023 Tr. at 88.) She described the foster parents as bonded with C.W. III and testified C.W. III is "very attached emotionally" to the foster parents, referring to them as "mom and dad." (Nov. 2, 2023 Tr. at 88.) The guardian ad litem testified C.W. III seems like "part of the family" when he's with the foster family. (Nov. 2, 2023 Tr. at 88.) Additionally, the guardian ad litem said the foster family has adapted to meet C.W. III's evolving needs as he has gotten older. (Nov. 2, 2023 Tr. at 89.) The guardian ad litem estimated she visited with C.W. III approximately 20 times during the pendency of the case. (Nov. 2, 2023 Tr. at 98.)

{¶ 27} With regard to mother, the guardian ad litem testified she "made many attempts to contact" mother but was only able to speak with her at one visitation. (Nov. 2, 2023 Tr. at 89.) The guardian ad litem said mother frequently changed her phone number, testifying mother had three or four different phone numbers during the pendency of the case. She described attempting to contact mother at her most recent number whenever she received that information. (Nov. 2, 2023 Tr. at 103.) The guardian ad litem said that on one occasion, the phone number she had for mother led to a recorded message instructing the caller to try a different phone number, but when the guardian ad litem called that different number, the voicemail box was either disconnected or full. (Nov. 2, 2023 Tr. at 104.) The guardian ad litem testified she was not able to make contact with mother throughout the pendency of the case "until very recently" and she had not been able to visit mother at either her current or former addresses. (Nov. 2, 2023 Tr. at 105.) The recent contact the guardian ad litem referred to occurred during a court hearing. (Nov. 2, 2023 Tr. at 106.)

{¶ 28} Because she was only able to observe mother with C.W. III for one hour during a supervised visit, the guardian ad litem said it was "hard for [her] to judge" whether C.W. III has a bond with mother. (Nov. 2, 2023 Tr. at 89.) The guardian ad litem described

mother as appropriate and affectionate, and she also noted C.W. III is very social so he seemed comfortable with mother. (Nov. 2, 2023 Tr. at 89-90.)

{¶ 29} As to father, the guardian ad litem testified he has maintained communication with her and has been engaged in updating her on his progress. (Nov. 2, 2023 Tr. at 90.) The guardian ad litem said she was able to visit father at his previous address. (Nov. 2, 2023 Tr. at 90.) She also observed father interacting with C.W. III at a supervised visit and testified C.W. III "knows who * * * his birth parents are" but that it is difficult "to make a judg[]ment on what their bond is." (Nov. 2, 2023 Tr. at 91.)

{¶ 30} Ultimately, the guardian ad litem testified it was her recommendation the trial court grant FCCS's motion for permanent custody. (Nov. 2, 2023 Tr. at 91.) The guardian ad litem testified C.W. III is in need of a legally secure and permanent placement and that it is in C.W. III's best interest for FCCS to be granted permanent custody. (Nov. 2, 2023 Tr. at 91-92.)

{¶ 31} Following the testimony of the four witnesses, the trial court indicated from the bench that it would grant the permanent custody motion, finding it was in C.W. III's best interest to do so. (Nov. 2, 2023 Tr. at 133.) In a February 1, 2024 decision and judgment entry, the trial court granted the PCC motion, terminated mother's and father's parental rights, and placed C.W. III in the permanent custody of FCCS. Mother and father timely appeal.

## II.  Assignments of Error

{¶ 32} Mother raises the following two assignments of error for our review:

> [I.] Rule 48 was violated when the guardian ad litem only watched the Mother with Child for one hour and did not visit with Mother or visit any homes of Mother over a two-year time period. Due to this violation, the court erred when it relied on any testimony of the [guardian ad litem].

> [II.] The Court erred when it did not grant Mother her requested continuance on September 11, 2023.

{¶ 33} Additionally, father raises the following sole assignment of error for our review:

The juvenile court's judgment that permanent court commitment of the minor child to the Franklin County Children Services was in the minor child's best interest is against the manifest weight of the evidence.

### III.  Mother's First Assignment of Error–Guardian Ad Litem

{¶ 34}  In her first assignment of error, mother argues the guardian ad litem did not comply with Sup.R. 48.03(D).  As a result, mother asserts the trial court erred in relying on the guardian ad litem's testimony when ruling on the PCC motion.

{¶ 35}  Parents have a constitutionally protected fundamental interest in the care, custody, and control of their children.  *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, ¶ 19, quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re Murray*, 52 Ohio St.3d 155, 157 (1990) (recognizing the right to raise one's children is a basic and essential civil right).  However, these rights are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child.  *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979); *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, ¶ 11.  In certain circumstances, therefore, the state may terminate the parental rights of natural parents when such termination is in the child's best interest.  *D.A.* at ¶ 11, citing *Cunningham* at 105.  Because termination of parental rights "has been described as 'the family law equivalent of the death penalty in a criminal case,' " parents " 'must be afforded every procedural and substantive protection the law allows.' "  *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991).

{¶ 36}  R.C. 2151.414 governs the termination of parental rights.  *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42.  Pursuant to R.C. 2151.414(B)(1), a trial court may grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that: (1) one of the five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies; and (2) it is in the best interest of the child to do so.  *In re Z.C.*, 173 Ohio St.3d 359, 2023-Ohio-4703, ¶ 7.  Clear and convincing evidence is the measure or degree of proof "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."  *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.  Clear and convincing evidence requires more than

a mere preponderance of the evidence but does not require proof beyond a reasonable doubt as in criminal cases. *Id.*

{¶ 37} An appellate court will not reverse a trial court's determination on a permanent custody motion unless it is not supported by the sufficiency of the evidence or it is against the manifest weight of the evidence, depending on the nature of the arguments presented by the parties. *Z.C.* at ¶ 18 (rejecting use of the abuse of discretion standard in reviewing permanent custody determinations under R.C. 2151.414 and clarifying that separate standards for sufficiency and manifest weight of the evidence apply instead). The sufficiency of the evidence tests the adequacy of the evidence: a court of appeals should affirm a trial court when the evidence, if believed, is legally sufficient to support the verdict as a matter of law. *Z.C.* at ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The manifest weight of the evidence concerns the effect of the evidence in inducing belief. *Z.C.* at ¶ 13, citing *Thompkins* at 387. "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Z.C.* at ¶ 14, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 21. Furthermore, "although the phrase 'some competent, credible evidence' can be helpful in describing the reviewing court's deferential role in the manifest-weight analysis, it should not be used as a substitute for the separate sufficiency and manifest-weight analyses appropriate for permanent-custody determinations." *Id.* at ¶ 15.

{¶ 38} Mother does not specifically argue the trial court's decision to award permanent custody of C.W. III to FCCS was against the manifest weight of the evidence. Instead, mother argues the trial court erred in relying on the guardian ad litem's testimony and report in making its best interest of the child determination. As an initial matter, we note mother did not object below to the admission of the guardian ad litem's report or to the guardian ad litem's testimony and, therefore, has forfeited all but plain error. *In re A.A.*, 10th Dist. No. 23AP-152, 2024-Ohio-224, ¶ 42, citing *In re D.E.*, 10th Dist. No. 20AP-83, 2021-Ohio-524, ¶ 76. " 'In civil cases, the plain error doctrine is not favored and may only be applied in the extremely rare case involving exceptional circumstances such that the

error, if left uncorrected, would challenge the fairness, integrity, or public reputation of the judicial process itself.' " *D.E.* at ¶ 76, quoting *Brisco v. U.S. Restoration & Remodeling, Inc.*, 10th Dist. No. 18AP-109, 2019-Ohio-5318, ¶ 25.

{¶ 39} Pursuant to R.C. 2151.281(G), a juvenile court must appoint a guardian ad litem to protect the interest of a child in any proceeding for permanent custody under R.C. 2151.414. The statute requires the guardian ad litem to "perform whatever functions are necessary to protect the best interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services provided the child" by a public children services agency that has custody of the child. R.C. 2151.281(I). Additionally, the statute requires the guardian ad litem to file any motions or other court papers that are in the best interest of the child. R.C. 2151.281(I). If the guardian ad litem "fail[s] to faithfully discharge the guardian ad litem's duties," the statute directs the trial court to discharge the guardian ad litem and appoint another guardian ad litem. R.C. 2151.281(D).

{¶ 40} Through her assignment of error, mother does not allege the trial court erred in failing to discharge the guardian ad litem under R.C. 2151.281(D). Instead, mother argues the guardian ad litem failed to perform the duties outlined in the Supreme Court of Ohio's Rules of Superintendence and, as such, the trial court should not have relied on the guardian ad litem's testimony or report. More particularly, mother asserts the guardian ad litem failed to comply with Sup.R. 48.03(D).

{¶ 41} In domestic relations and juvenile court cases, the Rules of Superintendence contain provisions related to a court's appointment of a guardian ad litem. *In re A.S.*, 10th Dist. No. 21AP-249, 2022-Ohio-1861, ¶ 51. Sup.R. 48 contains a non-exhaustive list of the responsibilities and duties of a guardian ad litem. *A.S.* at ¶ 52. As relevant here, Sup.R. 48.03(D) provides:

> Unless specifically relieved by the court, the duties of a guardian ad litem shall include, but are not limited to, the following:
>
> (1) Become informed about the facts of the case and contact all relevant persons;

(2) Observe the child with each parent, foster parent, guardian or physical custodian;

(3) Interview the child, if age and developmentally appropriate, where no parent, foster parent, guardian, or physical custodian is present;

(4) Visit the child at the residence or proposed residence of the child in accordance with any standards established by the court;

(5) Ascertain the wishes and concerns of the child;

(6) Interview the parties, foster parents, guardians, physical custodian, and other significant individuals who may have relevant knowledge regarding the issues of the case. The guardian ad litem may require each individual to be interviewed without the presence of others. Upon request of the individual, the attorney for the individual may be present.

(7) Interview relevant school personnel, medical and mental health providers, child protective services workers, and court personnel and obtain copies of relevant records;

(8) Review pleadings and other relevant court documents in the case;

(9) Obtain and review relevant criminal, civil, educational, mental health, medical, and administrative records pertaining to the child and, if appropriate, the family of the child or other parties in the case;

(10) Request that the court order psychological evaluations, mental health or substance abuse assessments, or other evaluations or tests of the parties as the guardian ad litem deems necessary or helpful to the court;

(11) Review any necessary information and interview other persons as necessary to make an informed recommendation regarding the best interest of the child.

{¶ 42} Mother argues the guardian ad litem failed to comply with Sup.R. 48.03(D) because the guardian only observed mother with C.W. III for one hour and did not visit

with C.W. III at either parent's residence. Additionally, mother argues the guardian ad litem failed to visit alone with mother at mother's home.

{¶ 43} We are mindful that "[t]his court has consistently observed * * * that '[t]he Rules of Superintendence are internal housekeeping rules that create no substantive individual rights.' " *A.A.*, 2024-Ohio-224 at ¶ 50, quoting *In re R.P.*, 10th Dist. No. 20AP-538, 2021-Ohio-4065, ¶ 31, citing *D.E.*, 2021-Ohio-524 at ¶ 77; *In re S.S.*, 10th Dist. No. 17AP-681, 2018-Ohio-1249, ¶ 11. "Moreover, '[b]ecause Sup.R. 48 is a general guideline that lacks the force of statutory law, noncompliance with [Sup.R. 48] is not grounds for automatic exclusion of a [guardian ad litem's] report, testimony, or recommendation.' " *A.A.* at ¶ 50, quoting *R.P.* at ¶ 31. Instead, a juvenile court has discretion to consider the evidence of the guardian ad litem's report and testimony. *Id.*, citing *R.P.* at ¶ 31.

{¶ 44} Even if we were to construe mother's argument to be that the trial court plainly erred under R.C. 2151.281(D) in not requiring the guardian ad litem to faithfully discharge her duties, we do not agree with mother that, on the facts of this case, the guardian ad litem failed to do so. *See A.S.*, 2022-Ohio-1861 at ¶ 75 (finding plain error under R.C. 2151.281(D) where the juvenile court did not require the guardian ad litem to faithfully discharge his duties, did not discharge the guardian ad litem and appoint a new guardian ad litem for said failure, and admitted the guardian ad litem's report and testimony despite the guardian ad litem's deficiencies). Though mother argues the lack of contact between mother and the guardian ad litem demonstrates the guardian ad litem's inadequate performance, the record indicates the guardian ad litem made repeated efforts to contact and meet with mother. The FCCS caseworker reported having similar difficultly contacting and meeting with mother. As a result, mother's own lack of participation in the proceedings presented an obstacle to the guardian ad litem observing more contact between mother and C.W. III as opposed to a lack of diligence from the guardian ad litem in discharging her duties.

{¶ 45} We also note that while mother focuses on the minimal contact between the guardian ad litem and mother, the record indicates the guardian ad litem performed the other duties of a guardian ad litem contained in Sup.R. 48.03(D). The guardian ad litem reviewed all records and case filings, was familiar with C.W. III's medical and special needs, had frequent and regular contact with the foster family, communicated with C.W. III's

school, and visited with C.W. III approximately 20 times during the pendency of the case. Thus, this record does not support mother's contention that the guardian ad litem was deficient in the performance of her duties.

{¶ 46} As the trier of fact, it is for the trial court to assign weight to the guardian ad litem's testimony and recommendation. *In re B.T.*, 10th Dist. No. 21AP-485, 2022-Ohio-4093, ¶ 38. Additionally, the trial court has discretion to consider the report of a guardian ad litem even where the guardian ad litem does not fully comply with Sup.R. 48. *Id.*; *D.E.*, 2021-Ohio-524 at ¶ 92 (noting a juvenile court is not bound by a guardian ad litem's recommendation). Because the record indicates the lack of contact between mother and the guardian ad litem was attributable to mother's own lack of cooperation and the record further indicates the guardian ad litem faithfully discharged her duties in all other respects, this is not the " 'rare circumstance' " in which the guardian ad litem's deficiencies alone warrant reversal of the award of permanent custody. *A.A.* at ¶ 56, quoting *D.E.* at ¶ 92.

{¶ 47} Accordingly, mother cannot demonstrate plain error from the trial court's consideration of the guardian ad litem's testimony and report. We overrule mother's first assignment of error.

## IV. Mother's Second Assignment of Error–Denial of Continuance

{¶ 48} In her second and final assignment of error, mother argues the trial court erred when it failed to grant her request for a continuance.

{¶ 49} An appellate court will not reverse a denial of a continuance in a permanent custody case unless the trial court abused its discretion in denying the continuance. *In re J.R.*, 10th Dist. No. 24AP-271, 2024-Ohio-5619, ¶ 6, citing *In re J.B.*, 10th Dist. No. 08AP-1108, 2009-Ohio-3083, ¶ 26, citing *In re B.G.W.*, 10th Dist. No. 08AP-181, 2008-Ohio-3693, ¶ 23. An abuse of discretion connotes a decision that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983); *State ex rel. Deblase v. Ohio Ballot Bd.*, 173 Ohio St.3d 191, 2023-Ohio-1823, ¶ 27. In reviewing a trial court's denial of a continuance, "an appellate court weighs any potential prejudice to the movant against the court's right to control its own docket and the public's interest in the efficient dispatch of justice." *J.R.* at ¶ 6, citing *State v. Woods*, 10th Dist. No. 09AP-667, 2010-Ohio-1586, ¶ 24, and *In re M.K.*, 10th Dist. No. 09AP-1141, 2010-Ohio-2194, ¶ 14.

Further, " '[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' " *J.B.* at ¶ 26, quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).

{¶ 50} In evaluating a request for a continuance, a court considers: (1) the length of the requested delay; (2) whether the parties have requested and received other continuances; (3) the inconvenience to the parties, witnesses, opposing counsel, and the court; (4) whether the requested delay is for legitimate reasons or is merely dilatory, purposeful, or contrived; (5) whether the movant contributed to the circumstances giving rise to the request for a continuance; and (6) any other relevant factors, depending on the unique circumstances of each case. *J.R.* at ¶ 7, citing *Woods* at ¶ 24, citing *State v. Unger*, 67 Ohio St.2d 65, 67 (1981), and *J.B.* at ¶ 26.

{¶ 51} Considering all the circumstances surrounding mother's request for a continuance, we conclude the trial court did not abuse its discretion in denying her request. When mother requested a continuance on the day of trial, the request was for an indefinite period to allow mother additional time to attempt to meet her case plan objectives. However, by the time of trial, the case had already been continued four times. Each of those previous four continuances would have provided mother additional time to work toward her case plan goals.

{¶ 52} R.C. 2151.414(A)(2) requires a trial court to hold a trial on a PCC motion no later than 120 days after the agency files the motion except for "good cause" shown for a reasonable continuance. Generally, a trial court does not abuse its discretion in denying a request for a continuance when the PCC hearing is already past the 120-day deadline contained in R.C. 2151.414(A)(2). *J.R.*, 2024-Ohio-5619 at ¶ 8, citing *In re J.C.*, 10th Dist. No. 10AP-766, 2011-Ohio-715, ¶ 46. By the time of the September 11, 2023 trial, the PCC motion had already been pending for 480 days. When the parties appeared for the September 11, 2023 trial date, mother requested another continuance, which would have extended the trial date even further beyond the 120-day deadline in R.C. 2151.414(A)(2).

{¶ 53} Additionally, by the time of the permanent custody hearing, C.W. III had been in the custody of FCCS since August 2020, with the potential for adoptive placement with his current foster caregivers. *J.R.* at ¶ 8, citing *In re J.M.*, 10th Dist. No. 15AP-234,

2015-Ohio-3988, ¶ 26 (a trial court may consider the child's length of time in foster care and potential for adoptive placement as a relevant factor in determining whether to grant or deny a requested continuance). Though mother notes the first three continuances in the matter were made at the request of FCCS, mother does not articulate how granting another continuance when C.W. III had already been in the temporary custody of FCCS for more than three years would have been in C.W. III's best interest. Instead, the stated basis for mother's requested continuance was to allow her additional time to work toward her case plan objectives. By the time of trial, the case had been pending for more than three years and mother largely failed to participate in the case plan during that time. *In re K.J.*, 10th Dist. No. 17AP-457, 2018-Ohio-471, ¶ 22, citing *B.G.W.* at ¶ 24-28 (no abuse of discretion in denying a continuance request made on the day of the PCC hearing based on parent's stated desire to have additional time to show compliance with the case plan requirements as parent failed to show a commitment and willingness to meet the case plan objectives during the pendency of the case).

{¶ 54} For these reasons, the trial court's decision to deny the continuance request was reasonable and supported by the record. Because mother cannot show the trial court abused its discretion in denying her request for a continuance on the day of trial, we overrule mother's second and final assignment of error.

## V.  Father's Sole Assignment of Error–Best Interest of the Child

{¶ 55} In his sole assignment of error, father asserts the trial court erred in granting the motion for permanent custody and terminating his parental rights. More specifically, father argues the trial court's determination that it was in C.W. III's best interest to grant the PCC motion was against the manifest weight of the evidence.

{¶ 56} As outlined above, a trial court takes a two-step approach in considering whether to award permanent custody. *In re A.L.*, 10th Dist. No. 21AP-633, 2022-Ohio-4095, ¶ 29. First, the trial court must determine if any of the factors in R.C. 2151.414(B)(1) apply. *Id.*; *Z.C.*, 2023-Ohio-4703 at ¶ 7. Here, the trial court determined C.W. III could not or should not be placed with either parent within a reasonable time, had been abandoned, and had been in the custody of FCCS for 12 or more months of a consecutive 22-month period, thus satisfying R.C. 2151.414(B)(1)(a), (b), and (d). Father does not dispute that

C.W. III has been in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period, and father raises no argument as to the trial court's additional findings under R.C. 2151.414(B)(1). The record here supports the trial court's determination that one or more of the factors in R.C. 2151.414(B)(1) apply.

{¶ 57} Once the trial court determines one of the circumstances in R.C. 2151.414(B)(1)(a) through (e) applies, the trial court then must determine whether a grant of permanent custody is in the best interest of the child. *A.L.* at ¶ 31, citing *In re A.J.*, 10th Dist. No. 13AP-864, 2014-Ohio-2734, ¶ 16; *Z.C.* at ¶ 7. To determine the best interest of the child, R.C. 2151.414(D)(1) requires the trial court to consider all relevant factors including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e). R.C. 2151.414(D) does not assign any one factor "greater weight than the others." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.

{¶ 58} The evidence at trial supports the trial court's determination that granting permanent custody to FCCS is in C.W. III's best interest. Under R.C. 2151.414(D)(1)(a), in making its best interest determination, the trial court considers the interactions and relationships between the child and the individuals in the child's life, including the child's parents, siblings, relatives, and "any other person who may significantly affect the child." Both FCCS caseworkers and the guardian ad litem described father's interactions with C.W. III as appropriate. While the two caseworkers and the guardian ad litem testified C.W. III seemed to know who father was, all three were reluctant to say C.W. III is bonded to father, instead noting C.W. III is generally friendly and social in all his interactions. By contrast, the caseworkers and the guardian ad litem all agreed C.W. III is very attached to his foster parents, referring to them as "mom and dad" and relying on them for all his needs. (Nov. 2, 2023 Tr. at 88.) The guardian ad litem described C.W. III as seeming like part of the family when he is with his foster caregivers. The guardian ad litem also described the level of attention the foster caregivers give to C.W. III's special needs, ensuring he receives the appropriate medical care and therapies. (Nov. 2, 2023 Tr. at 98.) Additionally, the foster caregivers have expressed interest in adopting C.W. III.

{¶ 59} R.C. 2151.414(D)(1)(b) requires the trial court to consider the wishes of the child, either as expressed directly by the child or through the child's guardian ad litem. At the time of trial, C.W. III was three years old, and the trial court determined he has only limited capacity to express his wishes and was unable to understand the nature of the proceedings.

{¶ 60} Under R.C. 2151.414(D)(1)(c), the trial court considers the custodial history of the child. C.W. III has been in the continuous temporary custody of FCCS for 12 or more months of a consecutive 22-month period. Additionally, he has been placed with the same foster family since FCCS obtained temporary custody in August 2020. He has not been in father's custody or care since his birth and has never lived with father.

{¶ 61} R.C. 2151.414(D)(1)(d) addresses the child's need for legally secure placement and requires the trial court to consider whether such legally secure placement can be achieved without a grant of permanent custody to the agency. At trial, both of the caseworkers and the guardian ad litem testified C.W. III was in need of a legally secure placement, especially given his ongoing special needs, and that such placement could not

be achieved without a grant of permanent custody to FCCS. The trial court also noted father had not sufficiently remedied concerns to allow for reunification. The caseworkers testified that although father had maintained communication with the agency, he had largely been noncompliant with the terms of his case plan. Father failed to complete a drug and alcohol assessment, was inconsistent with completing random drug screens, had not secured stable housing (as he did not inform the case workers or guardian ad litem of his newly acquired housing prior to trial), and failed to visit with C.W. III for over two years despite the stated case plan objective of establishing a relationship with C.W. III.

{¶ 62} R.C. 2151.414(D)(1)(e) asks whether any of the factors in R.C. 2151.414(E)(7) to (11) apply. The trial court found, and the evidence supports the finding, that father had not visited or maintained any contact with C.W. III for more than 90 days and had therefore abandoned the child. *See* R.C. 2151.011(C) ("a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days"). Because the record demonstrates father had no contact with C.W. III for the entirety of 2021 and 2022, R.C. 2151.414(E)(10) applies.

{¶ 63} Based on all the testimony and evidence presented, including the entire case file, the trial court determined permanent custody is in C.W. III's best interest. Having reviewed the entire record, we find clear and convincing evidence supports the trial court's best interest determination. Though father participated in the court proceedings and repeatedly expressed a desire to be reunited with C.W. III, the evidence demonstrates father failed to remedy the concerns that led to C.W. III's removal in the more than three years that C.W. III was in the temporary custody of FCCS. Accordingly, the manifest weight of the evidence supports the trial court's determination that granting permanent custody to FCCS is in C.W. III's best interest.

{¶ 64} Because the manifest weight of the evidence supports the trial court's decision granting permanent custody of C.W. III to FCCS, we overrule father's sole assignment of error.

## VI. Disposition

{¶ 65} Based on the foregoing reasons, the trial court did not plainly err in considering the testimony and report of the guardian ad litem, and the trial court did not abuse its discretion in denying mother's request for a continuance on the day of trial. Additionally, the manifest weight of the evidence supports the trial court's determination that awarding permanent custody to FCCS is in C.W. III's best interest. Having overruled mother's two assignments of error and father's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

DORRIAN and LELAND, JJ., concur.